IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CVS HEALTH CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; and WAL-MART STORES, INC., | No. 4:17-cv-00323-TCK-FHM |
| Plaintiffs, | |
| vs. | |
| TODD HEMBREE, ATTORNEY GENERAL OF THE CHEROKEE NATION, in his official capacity; JUDGE CRYSTAL R. JACKSON, in her official capacity; and DOE JUDICIAL OFFICERS 1-5; | |
| Defendants. | |

**MEMORANDUM OF DEFENDANT ATTORNEY GENERAL TODD HEMBREE
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

153107-5

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PROCEDURAL HISTORY.................................................................................. 1

STANDARD FOR ISSUING A PRELIMINARY INJUNCTION ............................. 2

ARGUMENT....................................................................................................... 3

I.     PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON
THE MERITS ............................................................................................... 3

   A. Settled Law Directs a Federal Court to Require That Any Challenge to Tribal
Court Jurisdiction Be Decided First by the Tribal Court ................................. 3

   B. The Narrow Exceptions to the Exhaustion Requirement Apply Only Where it is
"Patently Obvious" That No Tribal Court Jurisdiction Exists........................... 6

   C. None of the Exceptions to the Exhaustion Requirement Applies Here .......... 8

      1. Plaintiffs have failed to establish that it is "patently obvious" that the tribal
court "clearly" lacks jurisdiction over this case ........................................... 9

         a. The Cherokee Nation courts have adjudicatory jurisdiction over this case
pursuant to the 1866 Treaty ..................................................................... 9

         b. The Cherokee Nation courts have adjudicatory jurisdiction over this case
pursuant to the Nation's "inherent sovereign power"................................ 13

            i.   *The Cherokee Nation has a well-recognized jurisdictional authority
within the 14-county Cherokee Nation Jurisdictional Area* ....................... 14

            ii.  *Plaintiffs' activities pose a direct threat to the health and welfare of
the Cherokee Nation and its members, and thus the tribal court has
jurisdiction over this case under the* Montana 2 *analysis* ........................... 20

            iii. *Plaintiffs have consensual commercial relationships with the Cherokee
Nation and its members, and thus the tribal court has jurisdiction over
this case under the* Montana 1 *analysis* ...................................................... 25

      2. There is no "express jurisdictional prohibition" on tribal court jurisdiction over
this case ....................................................................................................... 29

      3. There are adequate opportunities in tribal court to adjudicate plaintiff's
jurisdictional challenge............................................................................... 33

i

II.     PLAINTIFFS HAVE NOT SHOWN THEY WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS DENIED............................................................ 35

III.    THE CHEROKEE NATION WOULD BE INJURED BY THE GRANT OF A PRELIMINARY INJUNCTION .................................................................. 38

IV.     A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST ............................................................................. 40

V.      CONCLUSION.......................................................................................... 40

# TABLE OF AUTHORITIES

## CASES                                                                                                    Page(s)

*Alberty v. United States*, 162 U.S. 499 (1896) ............................................................11

*AT&T Corp. v. Oglala Sioux Tribe Util. Comm'n*, 2015 WL 5684937 (D.S.D. 2015) ................33

*Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587 (9th Cir. 1983) ....................................27

*Bank of Okla. v. Muscogee (Creek) Nation*, 972 F.2d 1166 (10th Cir. 1992) ............................5, 8

*Blue Legs v. U.S. BIA*, 867 F.2d 1094 (8th Cir. 1989) ........................................................32

*Booppanon v. Harrah's Rincon Casino & Resort*, 2007 WL 433250 (S.D. Cal. 2007) ..........22, 27

*Briggs & Stratton Corp. v. Local 232, Int'l Union*, 36 F.3d 712 (7th Cir. 1994) .........................36

*Burrell v. Armijo*, 456 F.3d 1159 (10th Cir. 2006) ........................................................... 5-6

*Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir. 1982) ........................................................ 26-27

*CDST-Gaming I, LLC v. Comanche Nation, Okla.*,
   2009 WL 10668664 (W.D. Okla. 2009) ...............................................................35

*Cherokee Nation v. Jewell,* 2017 WL 2352011 (E.D. Okla. 2017) ...............................................16

*Cheromiah v. United States*, 55 F. Supp. 2d 1295 (D.N.M. 1999) ........................................21, 23

*Chiwewe v. Burlington N. & Santa Fe Ry. Co.*, 2002 WL 31924768 (D.N.M. 2002) ..................37

*Choctaw Nation v. Oklahoma.*, 397 U.S. 620 (1970) .................................................................15

*Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*,
   142 F.3d 1325 (10th Cir. 1998) ...........................................................................12

*Corp. of President of the Church of Jesus Christ of Latter-Day Saints v. RJ*,
   221 F. Supp. 3d 1317 (D. Utah 2016) ...............................................................5, 22

*Corporan v. Wal-Mart Stores East, LP*, 2016 WL 3881341 (D. Kan. 2016) ...............................30

*Crowe & Dunleavy, P.C. v. Stidham*, 609 F. Supp. 2d 1211 (N.D. Okla. 2009) ..........................8

*Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011) ..................................7, 8, 37

*Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001) ...........................................................35

iii

*Dish Network Serv., L.L.C. v. Laducer*, 725 F.3d 877 (8th Cir. 2013) ........................................7, 36

*Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*, 746 F.3d 167 (5th Cir. 2014),
   *aff'd sub nom. Dollar Gen. Corp. v. Miss. Band of Choctaw Indians*,
   136 S. Ct. 2159 (2016) (per curiam) ........................................................................22

*Donius v. Mazzetti*, 2010 WL 3768363 (S.D. Cal. 2010) ............................................21

*El Paso Nat. Gas Co. v. Netzsosie*, 526 U.S. 473 (1999) .........................................31, 33

*Elliott v. White Mountain Apache Tribal Ct.*, 566 F.3d 842 (9th Cir. 2009) ....................21, 22

*Encana Oil & Gas (USA) Inc. v. St. Clair*, 2012 WL 12551492 (D. Wyo. 2012) ..............7, 34, 37

*Farmers Union Oil Co. v. Guggolz*, 2008 WL 216321 (D.S.D. 2008) ...........................27

*Fine Consulting, Inc. v. Rivera*, 915 F. Supp. 2d 1212 (D.N.M. 2013) ...........................6

*Franks v. Nimmo*, 683 F.2d 1290 (10th Cir. 1982) .......................................................36

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980) ...............................................36

*Gen. Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222 (10th Cir. 2007) ......................2

*Gonzales v. Oregon,* 546 U.S. 243 (2006) ...................................................................31

*Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978) ........................................................13

*Harjo v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976) ...................................................13

*Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.,* 133 F.3d 1087 (8th Cir. 1998) ...............27

*Hull v. Chevron U.S.A., Inc.*, 812 F.2d 584 (10th Cir. 1987) ......................................30

*Indian Country, U.S.A., Inc. v. Okla. Tax Comm'n*, 829 F.2d 967 (10th Cir. 1987) ...............13

*Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9 (1987) .........................................4, 34, 38, 39, 40

*Jaramillo v. Harrah's Entm't, Inc.*, 2010 WL 653733 (S.D. Cal. 2010) ...........................27

*Kaw Nation ex rel. McCauley v. Lujan*, 378 F.3d 1139 (10th Cir. 2004) ........................39

*Kerr-McGee Corp. v. Farley*, 115 F.3d 1498 (10th Cir. 1997) .................................5, 6, 31

*Kerr-McGee Corp. v. Farley*, 88 F. Supp. 2d 1219 (D.N.M. 2000) ..............................37

153107-5

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)................................................................34-35

*MacArthur v. San Juan Cty.*, 497 F.3d 1057 (10th Cir. 2007)......................................................14

*Marathon Oil Co. v. Johnston*, 2004 WL 4960751 (D. Wyo. 2004) ............................................34

*Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968) ...........................................13

*Montana v. U.S. EPA*, 137 F.3d 1135 (9th Cir. 1998) ..................................................................21

*Montana v. United States*, 450 U.S. 544 (1981) .....................................6, 13-14, 19, 20, 21-22, 26

*Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C. Cir. 1988) ..........................................13

*N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*,
    991 F.2d 458 (8th Cir. 1993) ..................................................................................................32-33

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236 (10th Cir. 2017) ..........3

*National Farmers Union Ins. Co. v. Crow Tribe of Indians*,
    471 U.S. 845 (1985)................................................................................. 3, 4-5, 6, 20, 22, 39, 40

*Norton v. Ute Indian Tribe*, 2017 WL 2952256 (10th Cir. 2017) .....................5, 6, 20, 21, 25, 29

*Okla. City Mun. Improvement Auth. v. HTB, Inc.*, 769 P.2d 131 (Okla. 1998) ...........................35

*Pac. Frontier v. Pleasant Grove City,* 414 F.3d 1221 (10th Cir. 2005) .........................................3

*People ex rel. Dep't of Pub. Aid v. Dent*, 614 N.E.2d 376 (Ill. App. Ct. 1993) ..........................35

*Petrogulf Corp. v. Arco Oil & Gas Co.*, 92 F. Supp. 2d 1111 (D. Colo. 2000)........................6, 29

*Phelps v. Hamilton*, 59 F.3d 1058 (10th Cir. 1995)....................................................................36

*Phillip Morris USA, Inc. v. King Mountain Tobacco Co.*,
    569 F.3d 932 (9th Cir. 2009) ....................................................................................................25

*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
    554 U.S. 316 (2008)..................................................................................................................21

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ................................................................................................36

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ..............................................12

153107-5

*Renegotiation Bd. v. Bannercroft Clothing Co.*, 415 U.S. 1 (1974) ..............................................36

*Rincon Mushroom Corp. v. Mazzetti*, 490 F. App'x 11 (9th Cir. 2012) .......................................21

*Rogers-Dial v. Rincon Band of Luiseno Indians*, 2011 WL 2619232 (S.D. Cal. 2011)...............21

*Smith v. Moffett*, 947 F.2d 442 (10th Cir. 1991) ................................................................5, 39, 40

*South Dakota v. Bourland*, 508 U.S. 679 (1993) .........................................................................12

*Sprint Commc'ns Co., L.P. v. Native Am. Telecom, LLC*,
    2010 WL 4973319 (D.S.D. 2010)...........................................................................................33

*Sprint Commc'ns Co., L.P. v. Wynne*, 121 F. Supp. 3d 893 (D.S.D. 2015) ..........................28, 33

*St. Isidore Farm LLC v. Coeur d'Alene Tribe of Indians*,
    2013 WL 4782140 (D. Idaho 2013).......................................................................................21

*Strate v. A-1 Contractors*, 520 U.S. 438 (1997) ........................................................................29

*Talton v. Mayes*, 163 U.S. 376 (1896) .........................................................................................9

*Texaco, Inc. v. Zah*, 5 F.3d 1374 (10th Cir. 1993)......................................................................40

*Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226 (10th Cir. 2014)..................5, 6, 14, 29, 38

*United States v. Dion*, 476 U.S. 734 (1986)................................................................................12

*U.S. ex rel Mackey v. Coxe*, 59 U.S. 100 (1855) .........................................................................9

*U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants,
    Inc.*, 883 F.2d 886 (10th Cir. 1989) .......................................................................................3

*UNC Res., Inc. v. Benally*, 514 F. Supp. 358 (D.N.M. 1981) ..............................................22, 38

*UNC Res., Inc. v. Benally*, 518 F. Supp. 1046 (D. Ariz. 1981) ..................................................38

*United Planners Fin. Servs. of Am., L.P., v. Sac and Fox Nation*,
    2015 WL 3756181 (W.D. Okla. 2015) ....................................................................................5

*United States ex rel. Lummi Indian Nation v. Washington*,
    2007 WL 3273545 (W.D. Wash. 2007).................................................................................21

*Valenzuela v. Silversmith*, 699 F.3d 1199 (10th Cir. 2012).........................................................5

*Vandever v. Osage Nation Enter., Inc.*, 2009 WL 702776 (N.D. Okla. 2009)...........................33

vi

*Worcester v. Georgia*, 31 U.S. 515 (1832) ....................................................................9

## FEDERAL TREATIES, STATUTES AND REGULATIONS

Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478 ................................................10, 15

Treaty of Washington, July 19, 1866, 14 Stat. 799...........................................9, 10, 12, 15

Act of June 7, 1897, 30 Stat. 62 .............................................................................11

Act of Mar. 1, 1889, 25 Stat. 783...........................................................................11

Act of May 2, 1890, 26 Stat. 81 .............................................................................11

Controlled Substances Act (CSA), 21 U.S.C. §§ 801-904 ........................................29

Curtis Act, 30 Stat. 495 (1898) ........................................................................13, 15

Internal Revenue Code, 26 U.S.C. § 168(j)(6) ........................................................17

Judiciary Act of 1875, 18 Stat. 470........................................................................12

Oklahoma Enabling Act, 34 Stat. 267 (1906)......................................................11-12

Oklahoma Indian Welfare Act of 1936, 49 Stat. 1967 ..............................................13

Price-Anderson Act, 42 U.S.C. ch. 23 ....................................................................31

Schedules of Controlled Substances: Placement of Tramadol into Schedule IV,
    79 Fed. Reg. 37623 (Jul. 2, 2014).....................................................................32

21 U.S.C. § 882(a) .............................................................................................32

21 U.S.C. § 882(c) .............................................................................................32

21 U.S.C. § 903..................................................................................................31

25 U.S.C. § 1452(d) ............................................................................................16

25 U.S.C. § 3103(12) ..........................................................................................18

25 U.S.C. § 3202(9) ............................................................................................18

25 U.S.C. § 3653(3) ............................................................................................16

153107-5

25 U.S.C. § 3681(a)(1) ..............................................................................................16

25 U.S.C. § 4302(4)(B)(i) ..........................................................................................18

25 U.S.C. § 5363(c) ...................................................................................................17

25 U.S.C. §§ 5384-85 ................................................................................................17

29 U.S.C. § 741(d) ....................................................................................................18

40 U.S.C. § 523(b)(2) ................................................................................................18

42 U.S.C. § 6972(a) ...................................................................................................32

49 U.S.C. §1811(a)(1) ...............................................................................................33

25 C.F.R. § 151.2(f) ...................................................................................................16

25 C.F.R. §§ 1000.125-.126 .......................................................................................17

## STATE STATUTES

2012 Okla. Sess. Law Serv. 25 (West) .......................................................................32

815 Ill. Comp. Stat. § 505/2 ..................................................................................... 30

Ark. Code Ann. § 4-88-113(a) ...................................................................................35

Ark. Code Ann. § 4-88-113(a)(3) ...............................................................................35

D.C. Code § 28-3904(x) .............................................................................................30

Fla. Stat. § 501.204(2) ...............................................................................................30

Mass. Gen. Laws. ch. 93A, § 2(b) .............................................................................30

Oklahoma Uniform Controlled Dangerous Substances Act,
   Okla. Stat. Ann. tit. 63, ch. 2 ................................................................................32

Okla. Stat. Ann. tit. 12, ch. 2, R. 30(B) ......................................................................13

Okla. Stat. Ann. tit. 15, § 752(13) ..............................................................................35

Okla. Stat. Ann. tit. 15, § 752(14) ..............................................................................35

viii

Okla. Stat. Ann. tit. 15, § 753(20)......................................................35

Okla. Stat. Ann. tit. 15, § 756.1(A)....................................................35

Okla. Stat. Ann. tit. 15, § 761.1(C)....................................................35

Okla. Stat. Ann. tit. 63 § 2-206(B).....................................................32

## CHEROKEE NATION STATUTES

CHEROKEE CONST. art. II ...................................................................15

Cherokee Nation Unfair and Deceptive Practices Act,
   12 CNCA §§ 21-28 (2016) ..............................................................2

12 CNCA § 2 as amended by Leg. Act 16-16, § 3 (2016)...................16

18 CNCA § 208 ...................................................................................16

26 CNCA § 3(18)..................................................................................16

27 CNCA § 104 ...................................................................................15

68 CNCA § 102 ...................................................................................16

68 CNCA § 103(4) ..............................................................................16

68 CNCA § 1353 .................................................................................16

## OTHER AUTHORITIES

11A Fed. Prac. & Proc.: Civ. § 2948.1 (3d ed. 2017 update) ................. 35-36

2006 IHS Compact, § 1.3.....................................................................17

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (2012 ed.)................................ 15, 17-18

Law Enforcement Agreement Between and Among the Cherokee Nation, the United States
of America, the State of Oklahoma and its Political Subdivisions, et al. (1992)..........................18

Motor Vehicle Licensing Compact Between the Cherokee Nation and The State of
Oklahoma For Lands Located Outside the Compact Jurisdictional Area of The Cherokee
Nation (2013) ..........................................................................................19

153107-5

*Motor Vehicle Licensing Compact for Lands Located Within the Compact Jurisdictional Area of the Cherokee Nation* (2002) ........................................................................... 18-19

Notice 98-45, 1998-35 I.R.B. 7 (Aug. 31, 1998) ...........................................................17

Scott Higham and Lenny Bernstein, *Drugmakers and Distributors Face Barrage of Lawsuits over Opioid Epidemic*, The Washington Post A3 (July 5, 2017) ......................................1

Substance Abuse & Mental Health Servs. Admin., *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables* tbls.1.1A, 5.14A (2016) ..................................................23

x

## INTRODUCTION

"There is an epidemic of prescription opioid abuse sweeping through Indian country and across the United States.  It is an epidemic of unprecedented proportions in the recent history of the Cherokee Nation, leaving in its wake a substantial loss of resources, addiction, disability and death."  Tribal Court Petition ¶1 (Orensten Decl., Ex. 1A).

The underlying tribal court complaint in this matter, pending before the District Court of the Cherokee Nation, describes the devastating impact on the Cherokee Nation and its citizens wrought by this opioid epidemic, and its costs to the Cherokee people in deaths, broken families, injured children, social dislocation and crime, as well as the consequent financial burdens imposed on the Cherokee Nation government.  Just as state and local governments throughout the United States—including most recently the State of Oklahoma—are seeking redress in their own courts for these same harms to their citizens,[1] so too the Cherokee Nation, in an expression of its sovereign right and duty to protect its own citizens, filed suit in the courts of the Cherokee Nation to seek redress for the harms that have been imposed on it by the unlawful activities of distributors and retailers of opioid drugs.

## PROCEDURAL HISTORY

On April 20, 2017, the Cherokee Nation filed a petition in the Cherokee Nation District Court against three companies which distribute opioid drugs in the Cherokee Nation (McKesson Corp., Cardinal Health, Inc. and AmerisourceBergen) and three companies that sell such drugs in

---

[1]    "Within the past year, at least 25 states, cities and counties have filed civil cases against manufacturers, distributors and large drugstore chains that make up the $13 billion-a-year opioid industry. In the past few weeks alone, the attorneys general for Ohio and Missouri, along with the district attorneys for three counties in Tennessee, filed suits against the industry—and the attorney general for Oklahoma filed suit on Friday." Scott Higham and Lenny Bernstein, *Drugmakers and Distributors Face Barrage of Lawsuits over Opioid Epidemic*, THE WASHINGTON POST A3 (July 5, 2017).

the Nation (CVS Health, Walgreens Boots Alliance Inc., and Wal-Mart Stores, Inc.).[2]  The Nation alleges the companies have knowingly or negligently distributed and dispensed prescription opioid drugs within the Cherokee Nation in a manner that foreseeably injured, and continues to injure, the Nation and its citizens, in violation of the Cherokee Nation Unfair and Deceptive Practices Act, CHEROKEE NATION CODE ANN. (CNCA) tit. 12, §§ 21-28 (2016) (Orensten Decl., Ex. 1B), which, *inter alia*, prohibits any "deceptive acts or practices" in the conduct of trade or commerce in the Cherokee Nation.  In addition, the complaint sets forth four common law claims for nuisance, negligence, unjust enrichment and civil conspiracy.  On June 12, 2017, all defendants filed motions to dismiss in the tribal court, arguing, *inter alia,* that the court lacks subject matter and personal jurisdiction.  Those challenges to the tribal court's jurisdiction are pending before the tribal judge. No other proceedings have taken place in the tribal court.

On June 8, 2017, the tribal court defendants filed a Complaint and Motion for a Preliminary Injunction in this Court, seeking a declaration that the tribal court has no jurisdiction over the Nation's case, and injunctive relief to block the tribal court action.  On June 27, 2017, the tribal court, as a matter of comity, issued a stipulated stay of all proceedings, pending resolution of the preliminary injunction motion in this Court.

## STANDARD FOR ISSUING A PRELIMINARY INJUNCTION

"'[A] preliminary injunction is an extraordinary remedy; it is the exception rather than the rule.'" *Gen. Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1226 (10th Cir. 2007) (citation omitted).  "Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established." *U.S.*

---

[2]    The Cherokee Nation's First Amended Petition, filed on July 19, 2017, also names several of the plaintiffs' subsidiaries that operate in Oklahoma, including Cardinal Health 110, LLC; Oklahoma CVS Pharmacy LLC; and Walgreen Co.  *See* Nimmo Decl. ¶14, Ex. 6.

2

*ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-889 (10th Cir. 1989) (internal citations omitted); *see also N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017) ("the right to relief must be clear and unequivocal").

To secure a preliminary injunction a movant must establish four factors: "(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *N.M. Dep't of Game and Fish,* 854 F.3d at 1246 (internal citation omitted); *see also Pac. Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1231 (10th Cir. 2005).

## ARGUMENT

### I.     PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

Plaintiff-movants (the tribal court defendants) are not "substantially likely" to succeed on their claim that they can bypass their tribal court remedies—and need not first exhaust those remedies—to test the jurisdiction of the Cherokee Nation District Court over the Cherokee Nation's case against them.  Indeed, the law is well-settled that this Court must, as a matter of comity, require plaintiffs to exhaust their jurisdictional defenses in the tribal court before this Court rules on, much less enjoins, the tribal court proceedings for lack of jurisdiction.

### A.     Settled Law Directs a Federal Court to Require That Any Challenge to Tribal Court Jurisdiction Be Decided First by the Tribal Court.

Two Supreme Court cases firmly establish the rule that federal court challengers to tribal court jurisdiction must first exhaust their tribal court remedies on any jurisdictional issue.  *National Farmers Union Insurance Co. v. Crow Tribe of Indians,* 471 U.S. 845, 855-56 (1985); *Iowa Mutual*

3

*Insurance Co. v. LaPlante*, 480 U.S. 9 (1987).  The Court said "the existence and extent of a tribal

court's jurisdiction" require "a careful examination of tribal sovereignty, the extent to which that

sovereignty has been altered, divested or diminished, as well as a detailed study of relevant statutes,

Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial

decisions."  *National Farmers*, 471 U.S. at 856.  And "that examination should be conducted in

the first instance in the Tribal Court itself."  *Id.* (emphasis added).  This is because "Congress is

committed to a policy of supporting tribal self-government and self-determination." *Id.*:

> That policy favors a rule that will provide the forum whose jurisdiction is being
> challenged the first opportunity to evaluate the factual and legal bases for the
> challenge. Moreover the orderly administration of justice in the federal court will
> be served by allowing a full record to be developed in the Tribal Court before either
> the merits or any question concerning appropriate relief is addressed.  The risks of
> the kind of "procedural nightmare" that has allegedly developed in this case will be
> minimized if the federal court stays its hand until after the Tribal Court has had a
> full opportunity to determine its own jurisdiction and to rectify any errors it may
> have made.

*Id.* at 856-57 (emphasis added).  Exhaustion of tribal court remedies "will encourage tribal courts

to explain to the parties the precise basis for accepting jurisdiction, and will also provide other

courts with the benefit of their expertise in such matters in the event of further judicial review."

*Id.* at 857.

In extending the exhaustion requirement in *LaPlante*, the Supreme Court noted that

"considerations of comity direct that tribal remedies be exhausted" before a challenge to tribal

court jurisdiction "is addressed by the District Court."  480 U.S. at 15 (emphasis added).

"Promotion of tribal self-government and self-determination require[] that the Tribal Court have

'the first opportunity to evaluate the factual and legal bases for the challenge' to its jurisdiction."

*Id.* at 15-16 (quoting *Nat'l Farmers,* 471 U.S. at 856).  Thus, "the federal policy supporting tribal

self-government directs a federal court to stay its hand in order to give the tribal court a 'full

4

opportunity to determine its own jurisdiction.'" *Id.* Although a tribal court's determination on jurisdiction is "ultimately subject to review" in federal court, this is only after all "available tribal remedies"—including tribal court appellate remedies—have been exhausted. *Id.* at 19.

This exhaustion requirement has been vigorously applied by the Tenth Circuit, which "ha[s] taken a strict view of the tribal exhaustion rule." *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1507 (10th Cir. 1997) ("federal courts should not intervene until the tribal courts have had a full opportunity to evaluate jurisdiction"); *see also Norton v. Ute Indian Tribe*, 2017 WL 2952256 at *2 (10th Cir. 2017) (federal courts "typically should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies . . . are exhausted") (internal quotation omitted); *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1237 (10th Cir. 2014) (exhaustion requirement "based on strong policy interests recognizing tribal sovereignty"); *Valenzuela v. Silversmith*, 699 F.3d 1199, 1206 (10th Cir. 2012) (exhaustion requirement "reinforces Congress's strong interest in promoting tribal sovereignty"); *Burrell v. Armijo*, 456 F.3d 1159, 1168 (10th Cir. 2006) (litigants are required "to exhaust their tribal court remedies before a district court may evaluate the existence of a tribal court's jurisdiction"); *Bank of Okla. v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1169 (10th Cir. 1992) ("The law of this circuit is that a federal court should not hear a challenge to tribal court jurisdiction until tribal court remedies have been exhausted."); *Smith v. Moffett*, 947 F.2d 442, 445 (10th Cir. 1991) (The Supreme Court "has assiduously advocated federal abstention in favor of tribal courts.").[3]

---

[3]    So too, the district courts within this Circuit have repeatedly dismissed or abated federal court challenges to tribal court jurisdiction until there is a final disposition of the jurisdictional issues by the tribal courts. *E.g., Corp. of President of the Church of Jesus Christ of Latter-Day Saints v. RJ*, 221 F. Supp. 3d 1317, 1328 (D. Utah 2016) (exhaustion "will promote tribal self-government" and "will allow the Tribal Court to assess its own jurisdiction in the first instance."); *United Planners Fin. Servs. of Am., L.P., v. Sac and Fox Nation*, 2015 WL 3756181, at *3 (W.D. Okla. 2015) ("Strong policy interests rooted in tribal sovereignty support" the exhaustion rule);

**B.    The Narrow Exceptions to the Exhaustion Requirement Apply Only Where It Is "Patently Obvious" That No Tribal Court Jurisdiction Exists.**

The exhaustion rule is subject to several exceptions.  The Supreme Court specified three in *National Farmers*: "where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *Nat'l Farmers*, 471 U.S. at 856 n. 21 (internal quotations and citations omitted).  The Tenth Circuit recognizes two additional exceptions: "when it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by the main rule established in *Montana v. United States*, 450 U.S. 544 (1981); or . . . it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement would serve no purpose other than delay."  *Norton*, 2017 WL 2952256 at *3 (quoting *Burrell*, 456 F.3d at 1168).

In this Circuit, "a substantial showing of eligibility" must be made by the party invoking any of these exceptions, and that party bears a heavy burden of proof.  *Thlopthlocco*, 762 F.3d 1238; *see also Kerr-McGee*, 115 F.3d at 1502.  Further, "the exceptions are applied narrowly." *Norton*, at *3 (quoting *Thlopthlocco*, 762 F.3d at 1239).  Indeed, exhaustion is required unless the claimed jurisdictional defects "are so <u>patently obvious</u> as to defy exhaustion, especially given the opportunity to later challenge wrongly invoked subject matter jurisdiction." *Thlopthlocco*, at 1239 (emphasis added); *see also Latter Day Saints*, 221 F.3d at 1322 (exception applies only "where it is 'patently obvious' that the Tribal Court lacks jurisdiction").  The exhaustion requirement is therefore triggered even if the claim of tribal court jurisdiction is merely "colorable."  *Norton,* at

---

*Fine Consulting, Inc. v. Rivera*, 915 F. Supp. 2d 1212 (D.N.M. 2013) (requiring exhaustion); *Petrogulf Corp. v. Arco Oil & Gas Co.*, 92 F. Supp. 2d 1111, 1117 (D. Colo. 2000) ("comity concerns require application of the tribal exhaustion rule").

153107-5

*3 (quoting *Thlopthlocco*, at 1240); *see also Encana Oil & Gas (USA) Inc. v. St. Clair*, 2012 WL 12551492, at *7 (D. Wyo. 2012) ("where a colorable claim of jurisdiction in the tribal court exists, exhaustion of tribal court remedies is ordinarily required and the federal court should defer to the exercise of its jurisdiction." (internal citation omitted)), *id.* at 8 (noting failure to present "the extreme circumstances indicating the clear lack of tribal court jurisdiction needed to subvert the tribal exhaustion rule") (emphasis added).[4]  Generally, exhaustion is excused only where tribal court jurisdiction is "automatically foreclosed." *Norton*, at *3 (quotation omitted).  And any doubt on the matter is to be resolved in favor of exhaustion.  Thus, in *Thlopthlocco* the Tenth Circuit concluded that the "substantial showing" necessary to invoke an exception to the exhaustion requirement had not been satisfied because "we cannot definitively say at this stage" that it had. *Thlopthlocco*, at 1240.[5]

Plaintiffs principally rely on *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011), a rare case where the Court excused exhaustion that is an outlier both on its facts and in its outcome.  *Crowe* involved an internal tribal dispute where two factions claimed to be the lawful tribal government.  *Id.* at 1144.  A law firm represented one group in a tribal court case against members of the other group, and was paid with tribal funds for that representation.  *Id.* at 1145. Subsequently, the tribal court ordered the law firm—which was not a party to the tribal court

---

[4]    *See also Latter Day Saints*, 221 F. Supp. 2d at 1327 (noting "[j]urisdictional discovery is necessary to develop the factual record before the court can conclude that the Tribal Court clearly lacks jurisdiction,"); *id.* at 1328 (dismissing federal court complaint so parties could conduct jurisdictional discovery in the tribal court).

[5]    The Eighth Circuit has a similar formulation: "[T]he exhaustion requirement should be waived only if the assertion of tribal court jurisdiction is frivolous or obviously invalid under clearly established law.  In circumstances where the law is murky or relevant factual questions remain undeveloped, the prudential considerations outlined in *National Farmers Union* require that the exhaustion requirement be enforced." *Dish Network Serv., L.L.C. v. Laducer*, 725 F.3d 877, 883 (8th Cir. 2013) (emphasis added).

7

case—to return the fees it had received. The law firm filed suit in federal court against the tribal court judge, claiming the tribal court lacked jurisdiction to order it to return the fees. *Id.* at 1146. This Court agreed, finding the lack of jurisdiction over the law firm so clear that exhaustion of tribal court remedies was not required. *Crowe & Dunleavy, P.C. v. Stidham*, 609 F. Supp. 2d 1211, 1226 (N.D. Okla. 2009).

In affirming, the Tenth Circuit twice noted the "unique circumstances of the case." 640 F.3d. at 1157, 1158. Indeed, the panel acknowledged that "absent exceptional circumstances, federal courts typically 'should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted,'" *id.* at 1149 (quoting *Bank of Okla.*, 972 F.2d at 1170), and it recognized that exhaustion is required except where it is "clear that the tribal court lacks jurisdiction." *Id.* at 1150 (internal quotation omitted). But given the unusual set of facts, the Circuit concluded that the tribal court "plainly lacked jurisdiction" to order the non-party law firm to return the fees it had already received for work it had already done. *Id.* at 1158. The Court's decision was driven mostly by the fact there was no cause of action in the underlying case between the two tribal factions that had any nexus to the law firm's status as a member of the bar, *i.e.*, no claim that the firm had acted unprofessionally or that the fees were unreasonable. *Id.* at 1151. *Crowe*'s "unique circumstances" are not present here.

### C.     None of the Exceptions to the Exhaustion Requirement Applies Here.

Plaintiffs claim they are not required to exhaust their jurisdictional objections in tribal court because "the Tribal Court clearly lacks jurisdiction and the exhaustion requirement would serve no purpose other than delay." Pls.' Mot. at 20. They also claim the assertion of tribal court jurisdiction "violates express jurisdictional prohibitions," *id.*, and that the tribal court forum denies them "an adequate opportunity to challenge the Cherokee Nation Court's jurisdiction." *Id.* at 21.

8

Plaintiffs fail to carry their "substantial" burden with any of these arguments.

**1.    Plaintiffs have failed to establish that it is "patently obvious" the tribal court "clearly" lacks jurisdiction over this case.**

The Cherokee Nation courts have jurisdiction to adjudicate the claims against plaintiffs under two sources of authority: (a) the 1866 Treaty of Washington, and (b) the Nation's "inherent sovereign power."  Under neither authority is it "patently obvious" that the tribal court lacks jurisdiction.  If the plaintiffs wish to contest that jurisdiction, they must accordingly exhaust their challenges through the motions to dismiss they have already filed in the tribal court.

**a.    The Cherokee Nation courts have adjudicatory jurisdiction over this case pursuant to the 1866 Treaty.**

Indian tribes have "always been considered as distinct, independent political communities retaining their original natural rights," *Worcester v. Georgia*, 31 U.S. 515, 519 (1832), and exercising powers of self-government that pre-date the Constitution.  *Talton v. Mayes*, 163 U.S. 376, 384 (1896).  In the case of the Cherokee Nation, the authority to maintain and operate a judiciary to hear causes of action that arise inside the Nation has long been recognized by the United States, *see Talton*, at 385 (recognizing exclusive authority of Cherokee judiciary to interpret Cherokee law); *U.S. ex rel Mackey v. Coxe*, 59 U.S. 100, 102 (1855) (giving full faith and credit to probate order of Cherokee court), and was expressly reserved to the Nation by Article 13 of the 1866 Treaty of Washington, July 19, 1866, 14 Stat. 799.

Article 13 reserves to the "judicial tribunals of the [Cherokee N]ation . . . exclusive jurisdiction in all civil . . . cases . . . where the cause of action shall arise in the Cherokee Nation . . . ."  This jurisdictional provision, unique among the treaties of the tribes removed to Oklahoma, acknowledges the primacy of the Cherokee Nation judiciary as a part of the Nation's right to self-government, and confers singular Treaty-based status upon it.  It facially provides the courts of the

Cherokee Nation with jurisdiction over the tribal court case here:  the causes of action in the tribal court complaint "arise" from the plaintiffs' violations of Cherokee Nation law in the distribution and sale of opioids within the Nation's boundaries recognized in the 1866 Treaty.[6]

To be sure, Article 13 provides that the grant of jurisdiction to the Cherokee courts is subject to an overriding power that the United States reserved to itself in the same provision: the Cherokee Nation agreed that "a court or courts may be established by the United States in [the Indian] Territory, with such jurisdiction and organized in such manner as may be prescribed by law."[7]  Given that the Indian Territory included the territory of the Cherokee Nation, this provision gave Congress a right to establish courts in the territorial jurisdiction of the Nation.  But unless and until Congress did so, and only to the extent that Congress did so, Article 13 granted the Nation jurisdiction over civil actions in its territorial area.  And even if Congress exercised its Article 13 power to establish courts in the Indian Territory, the Nation "retain[ed]" its own authority under Article 13 to exercise jurisdiction over claims arising in its territory to the extent not inconsistent with the courts established by Congress.

---

[6]      The area "in the Cherokee Nation" referenced in Article 13 is the treaty territory of the Cherokee Nation set forth in the 1835 and 1866 treaties (an area that encompasses all or parts of 14 counties in northeastern Oklahoma, *see infra* at 14, n.10).  *See* 1866 Treaty, art. 31 (incorporating previous treaties, including *inter alia* Treaty of New Echota, arts. 2-4, Dec. 29, 1835, 7 Stat. 478 (providing boundaries of fee simple transfer of lands to the Cherokee Nation)); *id.* art. 16 (reducing Nation's lands by opening lands west of the 96th parallel).

[7]      Article 13 provides in full:

The Cherokees also agree that a court or courts may be established by the United States in said Territory, with such jurisdiction and organized in such manner as may be prescribed by law: *Provided*, That the judicial tribunals of the nation shall be allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their country in which members of the nation, by nativity or adoption, shall be the only parties, or where the cause of action shall arise in the Cherokee Nation, except as otherwise provided in this treaty.

153107-5

Congress in 1889 exercised its reserved authority to establish a federal territorial court in the Indian Territory, *see* Act of Mar. 1, 1889, ch. 333, § 1, 25 Stat. 783, and granted it jurisdiction "in all civil cases" except those between persons of Indian blood. *Id.* § 6, 25 Stat. at 784. In 1890, Congress expanded the authority of that territorial court, giving it jurisdiction over all civil cases except those involving only members of the same tribe (over which tribal courts retained exclusive jurisdiction). Act of May 2, 1890, ch. 182, §§ 29-30, 26 Stat. 81, 93-94.

As the Supreme Court explained in *Alberty v. United States*, 162 U.S. 499, 502-03 (1896), the jurisdictional provisions of these laws "supersede[d]" the tribal courts' "exclusive jurisdiction in all civil and criminal cases" arising in the Cherokee Nation. Although *Alberty* concluded that the Nation no longer had <u>exclusive</u> jurisdiction over all cases arising in the Nation, 162 U.S. at 502-03, it did not say that the Nation lacked <u>any</u> jurisdiction over civil claims. (In any event, the provisions of the 1890 Act construed in *Alberty* have since been superseded, so *Alberty*'s holding does not control the question of tribal jurisdiction presented here.)

In 1897 Congress provided that, as of January 1, 1898, the District Court for the Indian Territory "shall have original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted . . . by any person in said territory." Act of June 7, 1897, ch. 3, 30 Stat. 62, 83. This "exclusive" jurisdictional grant to the territorial court was inconsistent with the grant of civil jurisdiction to the tribal courts and so divested the tribal courts of jurisdiction over civil claims, but only for so long as the territorial court existed and retained exclusive jurisdiction by statute. That exclusive jurisdiction ceased to exist pursuant to the Oklahoma Enabling Act, ch. 3335, §§ 1, 13, 34 Stat. 267, 275 (1906), in which Congress provided that, upon Oklahoma statehood, the Indian Territory would be abolished, and the District Court for the Indian Territory would be replaced with two federal district courts having the "same powers

11

and jurisdiction" of other federal courts; *i.e.,* over suits arising under federal laws or in diversity actions. Judiciary Act of 1875, ch. 137, § 1, 18 Stat. 470. The 1906 Enabling Act also authorized the creation of state courts in Oklahoma. § 17, 34 Stat. at 276-77. Thus, unlike the Indian Territory Court created in 1897, the federal and state courts created in 1906 to replace the Indian Territory Court were together given general jurisdiction—but not <u>exclusive</u> jurisdiction—over claims arising in the Nation's territory. Today they continue to have general, but not exclusive, jurisdiction over such claims (except where the tribal court otherwise has exclusive jurisdiction).

Under Article 13 of the 1866 Treaty, the Nation "retains" jurisdiction that is not otherwise displaced by Acts of Congress. When Congress in 1906 created federal and state courts with civil jurisdiction in Cherokee Nation territory, it necessarily displaced the Nation's "exclusive" jurisdiction over civil actions covered by Article 13. But unlike the territorial courts created by the 1897 Act, Congress in the 1906 Act never said that the federal and state courts, separately or together, had "exclusive" jurisdiction over civil claims arising in the Cherokee Nation. Thus, the fact that the Nation was divested of its "exclusive" jurisdiction under the Treaty did not mean that it lost <u>all</u> jurisdiction: it instead meant that its jurisdiction over civil actions under the Treaty became concurrent with state and federal jurisdiction under the 1906 Act. This result is the best reconciliation of Article 13's language with the subsequent Acts of Congress. Any other result— and any broader circumscription of the Nation's jurisdictional treaty rights—would violate the canon that treaty rights can be abrogated only by express or clear congressional action.[8]

---

[8]     *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 142 F.3d 1325, 1332-33 (10th Cir. 1998) (quoting *South Dakota v. Bourland*, 508 U.S. 679, 687 (1993)). To show abrogation by statute, it is "essential" to show "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *U.S. v. Dion*, 476 U.S. 734, 739-40 (1986). Further, the interpretation of statutes that affect Indian rights is guided by the Indian canons of construction, *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461 (10th Cir. 1997), under which statutes are

In short, the legal authorities plaintiffs cite, Pls.' Mot. at 11 n.7, either no longer exist or do not show that the Nation was stripped of concurrent jurisdiction over civil claims arising within its Treaty area.[9]  They certainly do not show that the Nation "plainly" lacks jurisdiction under the 1866 Treaty over the claims that are pending in tribal court, and plaintiffs' contrary conclusion is assuredly not "patently obvious."  To the extent there is doubt on the matter, or to the extent plaintiffs argue that the treaty jurisdiction of the Nation's judiciary has been diminished or abrogated, that is a question to which, as a matter of comity, the tribal court must be permitted to apply its expertise in the first instance, subject to further review in this Court thereafter.

### b.     The Cherokee Nation courts have adjudicatory jurisdiction over this case pursuant to the Nation's "inherent sovereign power."

Even absent a treaty or statute that provides jurisdiction, tribal courts possess adjudicatory jurisdiction as an incident of a tribe's "inherent sovereign power."  *Montana v. United States*, 450

---

presumed <u>not</u> to abrogate treaty rights, *Menominee Tribe of Indians v. U.S.*, 391 U.S. 404, 412 (1968), and ambiguities in statutes are interpreted in favor of the Indians.  *Ramah,* at 1461.

[9]     Plaintiffs also cite the Curtis Act, ch. 517, 30 Stat. 495 (1898), which provided that the tribal courts of several tribes, including the Cherokee Nation, would be abolished effective July 1, 1898, *id.* § 28, 30 Stat. at 504-05.  But the abolition of tribal courts was repealed by the Oklahoma Indian Welfare Act of 1936, 49 Stat. 1967 (OIWA), *see Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444-45 (D.C. Cir. 1988), which authorized the re-establishment of tribal courts and reaffirmed tribal governmental powers held by treaty, *see id.* at 1441, 1443 & n.6 (OIWA restored Creek Nation's powers of self-government guaranteed by treaty); *Indian Country, U.S.A., Inc. v. Okla. Tax Comm'n*, 829 F.2d 967, 981 (10th Cir. 1987) (in OIWA, Congress "repudiated" its earlier enactments that sought to terminate Oklahoma tribes and "restore[d] governmental powers" to them).  Indeed, Oklahoma State courts today give full faith and  credit to the decisions of Oklahoma tribal courts, including the courts of the Cherokee Nation.  Okla. Stat. Ann. tit. 12, ch. 2, R. 30(B).  More generally, despite the prior will of Congress to abolish tribal governments in preparation for statehood, the final dissolution of the Cherokee Nation and the other similarly situated tribes in eastern Oklahoma was never statutorily accomplished and the tribal governments were instead perpetuated.  *Harjo v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976); *Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978) (recounting the survival of tribal governments generally).

153107-5

U.S. 544, 564 (1981); *see also MacArthur v. San Juan Cnty.*, 497 F.3d 1057, 1068 (10th Cir. 2007) ("[i]n the absence of congressional legislation . . . tribal governments retain regulatory authority over all matters falling within their inherent sovereignty"). A tribe's inherent sovereign authority over nonmembers on a reservation can be exercised under one of the two "*Montana* exceptions": tribes have jurisdiction, first, over "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," *Montana*, 450 U.S. at 565, and second, over nonmember conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," *id.* at 565-6. *See Thlopthlocco*, 762 F.3d at 1234 (summarizing *Montana*).

  **i.**  ***The Cherokee Nation has a well-recognized jurisdictional authority within the 14-county Cherokee Nation Jurisdictional Area.***

    Plaintiffs press the argument that the Cherokee Nation cannot assert *any* jurisdiction over nonmembers under the *Montana* analysis because, they contend, that case applies only to a tribe's jurisdictional rights within "Indian country." They argue the Nation has no formally recognized "reservation" and therefore has no land which satisfies the definition of "Indian country." Pls.' Mot. at 7-11.

    This argument does not account for the special historical circumstances of the Cherokee Nation, which exercises various forms of governmental authority within a "Cherokee Nation Jurisdictional Area"—its treaty territory—that is recognized in tribal, state and federal law as encompassing all or parts of a 14-county area in northeastern Oklahoma.[10]

---

[10]  This area encompasses the whole or part of Adair, Cherokee, Craig, Delaware, Mayes, McIntosh, Muskogee, Nowata, Ottawa, Rogers, Sequoyah, Tulsa, Wagoner, and Washington counties in northeastern Oklahoma. Nimmo Decl. ¶5.

153107-5

This territory was set aside as land to be held in fee by the Cherokee in the 1835 Treaty of New Echota, 7 Stat. 478, in the period when the Cherokee (and the other of the "Five Civilized Tribes") were removed to Oklahoma. *See Choctaw Nation v. Okla.*, 397 U.S. 620, 626 (1970). "Under these treaties, the Five Tribes established comprehensive governments in their territories and exercised self-rule relatively free from federal interference." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §4.07[1][a] (2012 ed.). The Cherokee territory established by the 1835 Treaty was subsequently diminished in 1866 by Article 16 of the Treaty of Washington, in which the Cherokee ceded the western portion of their lands following the Civil War.

The subsequent history of the Cherokee Nation in the late nineteenth and early twentieth centuries is complex. In 1898, Congress enacted the Curtis Act, *supra*, which provided for allotment of the lands of the Five Tribes, ultimately resulting in much of the land in Cherokee territory passing into non-Indian ownership. COHEN'S HANDBOOK, § 4.07[1][a].[11] But the Cherokee Nation as a sovereign Indian tribe never ceased to exist, and its modern-day Constitution defines the boundaries of "the Cherokee Nation territory" as "those described by the patents of 1838 and 1846 diminished only by the Treaty of July 19, 1866 and the Act of March 3, 1893"— the 14-county jurisdictional area. CHEROKEE CONST. art. II, *available at* http://www.cherokee.org/ Portals/0/Documents/2011/4/308011999-2003-CN-CONSTITUTION. pdf. The Cherokee Nation Code asserts the Nation's jurisdiction over activity within this same 14-county jurisdictional area for multiple purposes.[12]

---

[11]    The Cherokee Nation and its members today retain ownership of a significant land base within the 14-county area, including over 50,000 acres held by the Nation in fee or trust status, and an additional 45,000 acres held by Nation citizens in restricted fee status. Justice Decl. ¶9.

[12]    *See, e.g.*, 27 Cherokee Nation Code Ann. (CNCA) § 104 ("[f]or purpose of enforcing the provisions of the Cherokee Nation Environmental Act, the Cherokee Nation shall have jurisdiction in the territorial boundaries of Cherokee Nation as defined in the Patent of 1838 . . ."), § 902(19)

15

Federal law likewise recognizes the Nation's special sovereign status within this 14-county area, and repeatedly deems this area to be a "reservation" that is to be treated as the legal equivalent of all other tribal reservations throughout the United States. For instance, in connection with the acquisition of tribal land to be held in trust by the United States, federal law defines the term "Indian reservation" to include "that area of land constituting the former reservation" of any tribe in Oklahoma, including the Cherokee Nation. 25 C.F.R. § 151.2(f); *see Cherokee Nation v. Jewell*, 2017 WL 2352011 (E.D. Okla. 2017) at *4, *9 (requiring consent of Cherokee Nation for any trust acquisition "within the treaty boundaries" of the 1835 and 1866 Cherokee treaties). And pertinently, federal law also authorizes the Nation to implement federal grants within its 14-county jurisdictional area to support "the development, enhancement, and continuing operation" of the Cherokee Nation court system. 25 U.S.C. § 3681(a)(1). This law provides federal support for tribal court systems on "Indian lands," which is defined at 25 U.S.C. § 3653(3) by reference to the term "reservation" in 25 U.S.C. § 1452(d). Section 1452(d), which is part of the Indian Financing Act, in turn defines "Reservation" to include "former Indian reservations in Oklahoma."[13]

---

("Jurisdiction" for purposes of water quality code defined as "territory legally described in the treaties of 1828, 1835 and 1838 and the Cherokee Nation patent issued in 1846 . . ."); 26 CNCA § 3(18) (defining "Jurisdictional boundaries" for elections as territory set by treaties and patents "which encompasses all or portions of the northeastern fourteen (14) counties of Oklahoma"); 18 CNCA § 208 (defining "in Cherokee Nation" for purposes of regulating limited liability corporations to mean "the historic reservation boundaries defined in the 1838 fee patent . . ."); 68 CNCA §§ 102, 103(4) (imposing tax on waste generated outside the Nation); 68 CNCA § 1353 (imposing motor vehicle licensing requirement on vehicles "within the reservation boundaries of Cherokee Nation"). *See* Nimmo Decl. ¶10, Ex. 2 (providing excerpts). Plaintiffs point to 20 CNCA § 25 as containing a restricted territorial limitation on the jurisdiction of the Cherokee Nation District Court, Pls.' Mot. at 9, but this provision was superseded by a 2016 amendment to the Nation's Code of Civil Procedure, which now provides, "The Courts of the Cherokee Nation may exercise jurisdiction on any basis consistent with the Cherokee Nation Constitution." 12 CNCA § 2, as amended by Leg. Act 16-16, § 3 (Orensten Decl. Ex. 1B).

[13]    25 U.S.C. 3653(3) states that it "treats the term 'former Indian reservations in Oklahoma' as including only lands which are within the jurisdictional area of an Oklahoma Indian Tribe (as

16

The Cherokee Nation has the authority under the Indian Self-Determination Act (ISDA) to enter annual self-governance funding agreements to run certain Bureau of Indian Affairs programs within the 14-county Cherokee Nation jurisdictional area. *See* 25 U.S.C. § 5363(c); 25 C.F.R. §§ 1000.125-.126. The Cherokee Nation also has the authority under the ISDA to enter annual self-governance compacts and funding agreements to run Indian Health Service programs located throughout the 14-county Cherokee Nation jurisdictional area. 25 U.S.C. §§ 5384-85.[14]

A host of other federal laws also equates the Nation's 14-county treaty area with an Indian "reservation." As the COHEN HANDBOOK notes, "Congress has frequently defined the term

---

determined by the Secretary of the Interior) and are recognized by such Secretary as eligible for trust land status under part 151 of title 25, Code of Federal Regulations . . . ." (emphasis added). This language, which also appears in the Internal Revenue Code, 26 U.S.C. § 168(j)(6), was construed by the IRS in a 1998 Bulletin. *See* Notice 98-45, 1998-35 I.R.B. 7 (Aug. 31, 1998). The ruling states that the Secretary of the Interior:

> has determined that . . . lands that are within the jurisdictional area of an Oklahoma Indian tribe are those lands within the boundaries of the last treaties, Executive Orders, federal agreements, federal statutes, and Secretarial Orders with the Oklahoma tribes. The Secretary of the Interior also has determined that any lands within the boundaries of the last treaties, Executive Orders, federal agreements, federal statutes, and Secretarial Orders with the Oklahoma tribes are lands eligible for trust land status under 25 CFR Part 151.

*Id.* at 8 (emphasis added). This definition of "lands that are within the jurisdictional area of an Oklahoma tribe" conforms with the description in the Cherokee Nation Constitution of the 14-county area as "the Cherokee Nation territory".

[14]    The 2006 Compact between the Secretary of Health and Human Services and the Cherokee Nation, in a section titled "Territorial Jurisdiction of the Cherokee Nation," describes "[t]he boundaries of the Cherokee Nation territory" as the areas set by the patents of 1838 and 1846, as modified, and further describes the Cherokee Nation "service area" as "within all or part of a fourteen county area located in the Claremore and Tahlequah Service Units of the Oklahoma City Area Indian Health Service." 2006 IHS Compact, § 1.3; *see* Nimmo Decl. ¶11, Ex. 3.

17

'reservation' for purposes of particular statutes to include 'former Indian reservations in Oklahoma.'" COHEN'S HANDBOOK § 4.07[1][b] at 292.[15]

The State of Oklahoma similarly recognizes the 14-county treaty area as territory in which the Cherokee Nation has governmental authority to administer specified state programs and to exercise sovereign rights. For instance, there is an extensive inter-governmental law enforcement compact that establishes the terms for cross-deputization of federal, state and tribal law enforcement personnel "within the boundaries of the Cherokee Nation." *Law Enforcement Agreement Between and Among the Cherokee Nation, the United States of America, the State of Oklahoma and its Political Subdivisions, et al.* (1992), at 1, *available at* https://www.sos.ok.gov/documents/filelog/54074.pdf. For purposes of the Agreement, the "Cherokee Nation's boundaries" are depicted on a map attached to the Compact as the 14-county Cherokee Nation jurisdictional area. Nimmo Decl., ¶12, Ex. 4.[16]

The State of Oklahoma and the Cherokee Nation have also entered into a *Motor Vehicle Licensing Compact for Lands Located Within the Compact Jurisdictional Area of the Cherokee*

---

[15]    *See e.g.*, 25 U.S.C. § 4302(4)(B)(i) (Cherokee Nation "jurisdictional area" is equivalent to a "reservation" for purposes of the Native American Business Development, Trade Promotion, and Tourism Act of 2000); 25 U.S.C. § 3202(9) (defining "Indian reservation" to include "former Indian reservation in Oklahoma" for purposes of federal programs to protect Indian children); 25 U.S.C. § 3103(12) (defining "reservation" to include "former Indian reservations in Oklahoma" for purposes of National Indian Forest Resources Management Act); 29 U.S.C. § 741(d) ("reservation" includes "former Indian reservations in Oklahoma" for purposes of Title I of the Rehabilitation Act of 1973); 40 U.S.C. § 523(b)(2) (recognizing jurisdictional area for purposes of transferring excess federal lands into tribal trust status); *see generally* COHEN'S HANDBOOK § 4.07[1][b] n. 41 (listing additional federal statutory examples).

[16]    A 2003 addendum adds an "Agreement and Protocol for Cross-Deputization" between the Cherokee Nation and the Oklahoma Bureau of Narcotics and Dangerous Drugs Control "to permit and facilitate the cross-deputization of law enforcement officers" between the Nation and the State drug enforcement agency in the same 14-county area. *See* https://www.sos.ok.gov/documents/filelog/91480.pdf.

18

*Nation* (2002), which allows the Nation to license motor vehicles owned by citizens of the Cherokee Nation pursuant to Cherokee Nation law.  The Compact defines the boundaries of the "Cherokee Nation Compact Jurisdictional Area" by reference to a map attached to the Compact, titled "Cherokee Nation 14-County Jurisdiction" and depicting the same 14-county Cherokee Nation jurisdictional area discussed above.  Nimmo Decl., ¶13, Ex. 5.[17]

In short, the modern day territory of the Cherokee Nation encompasses its treaty lands in the 14-county area in northeastern Oklahoma, and this territory is recognized in multiple enactments and for multiple purposes by both the United States and the State of Oklahoma as the Cherokee Nation's "jurisdictional area."  The boundaries of this jurisdictional area are defined by numerous federal laws to be equivalent to, and to serve the same functions as, the boundaries of an Indian "reservation."

And so too, these boundaries should serve as the Cherokee Nation's territorial area for purposes of applying the *Montana* test.  This is not to say that the Cherokee Nation can assert *per se* civil jurisdiction over all non-Cherokee persons working, residing or engaging in commerce in this area, or over their land.  But (even putting aside its Treaty-based argument), it does mean that the Nation can assert such jurisdiction in this area when the conduct of those nonmembers threatens "the political integrity, the economic security, or the health or welfare" of the Nation, or where the nonmembers enter into "consensual arrangements" with the Nation or its members.  *Montana,* 450 U.S. at 565.

---

[17]    This Agreement can be accessed at https://www.sos.ok.gov/documents/filelog/58613.pdf. This Agreement has been updated by a similar 2013 Agreement.  *See* https://www.sos.ok.gov/documents/filelog/89392.pdf

19

We are aware of no statute or judicial precedent that precludes application of the *Montana* test to the Cherokee Nation's jurisdictional area, and doing so is the position that is most consistent with the special treatment that federal and state law both give to "former reservations" in the State of Oklahoma. And of particular note, it is the position most consistent with the repeated acknowledgment by the United States and the State of Oklahoma as to the sovereign status of the Cherokee Nation within its recognized "jurisdictional area."

To the extent this is a question of first impression for this Court, it is a paradigmatic example of the kind of complex, multi-faceted issue to which this Court should, in the first instance, defer to the tribal court for an initial close review and judgment. As the Supreme Court said in *National Farmers*, a determination about the scope of tribal court jurisdiction often requires "a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions." 471 U.S. at 855-56. This general observation by the Court fits to a tee the jurisdictional issues that arise in the special context of the Cherokee Nation's treaty lands in Oklahoma. And as the Court said in *National Farmers*, "that examination should be conducted in the first instance in the Tribal Court itself." *Id.* at 856.

> ii.    *Plaintiffs' activities pose a direct threat to the health and welfare of the Cherokee Nation and its members, and thus the tribal court has jurisdiction over this case under the* <u>*Montana*</u> *2 analysis.*

Under the second *Montana* exception, a tribe can regulate nonmember conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," *Montana,* 450 U.S. at 566, and where "the challenged conduct could 'fairly be called catastrophic for tribal self-government.'" *Norton,* 2017 WL 2952256 at *6.

There is ample precedent showing that tribal jurisdiction under the second *Montana* exception is justified, and therefore necessarily "plausible," when nonmember conduct threatens

20

the health of a tribe's members, *see Cheromiah v. United States*, 55 F. Supp. 2d 1295, 1305 (D.N.M. 1999) (medical malpractice claims), or threatens reservation resources like timber and water.[18]

In *Norton*, the Tenth Circuit found the Ute Tribal Court had "colorable" jurisdiction under the second *Montana* exception over a trespass claim against nonmember police officers for their activities on tribal lands, and therefore exhaustion of tribal court remedies was required. *Norton*, 2017 WL 2952256 at *6. Because the alleged activities all arose on tribal land, the Court confined its analysis to those facts, and largely based its holding on a tribe's well-recognized right, as landowner, to exclude others from its land. *Id.* at *4; *see also Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 335 (2008) (regarding non-Indian activity on tribal lands, "'[r]egulatory authority goes hand in hand with the power to exclude.'") (citation omitted). But the *Montana* test was formulated primarily to address tribal "civil authority over the conduct of non-Indians on fee lands," 450 U.S. at 566 (emphasis added), and the Tenth Circuit in *Norton* therefore correctly did not limit *Montana* to activities occurring on tribal land. *Norton*, 2017 WL 2952256 at *3 ("tribes retain the right 'to exercise some forms of civil jurisdiction over non-Indians

---

[18]    *Elliott v. White Mountain Apache Tribal Ct.*, 566 F.3d 842, 850 (9th Cir. 2009) (jurisdiction over tort claim for fire that destroyed "millions of dollars of the tribe's natural resources"); *Montana v. U.S. EPA*, 137 F.3d 1135, 1141 (9th Cir. 1998) (recognizing inherent tribal jurisdiction over "threats to water rights"); *Rincon Mushroom Corp. v. Mazzetti*, 490 F. App'x 11, 12 (9th Cir. 2012) (jurisdiction over nonmembers' business operations on fee lands because it "could contaminate the tribe's sole water source and increase the risk of forest fires"); *St. Isidore Farm LLC v. Coeur d'Alene Tribe of Indians*, 2013 WL 4782140, at *5-7 (D. Idaho 2013) (threats to surface and ground water from contaminants in sewage being disposed of on fee land); *see United States ex rel. Lummi Indian Nation v. Washington*, 2007 WL 3273545, at *2, *7 n.7 (W.D. Wash. 2007) (plausible jurisdiction over groundwater withdrawals that could contaminate reservation aquifer); *Rogers-Dial v. Rincon Band of Luiseno Indians*, 2011 WL 2619232, at *5 (S.D. Cal. 2011) (colorable claim of jurisdiction where operation of a farm "'pose[s] direct threats to the Tribe's groundwater resources'"); *Donius v. Mazzetti*, 2010 WL 3768363, at *5 (S.D. Cal. 2010) (finding colorable jurisdiction where nonmember activity posed plausible threat to aquifer).

153107-5

on their reservations, <u>even on non-Indian fee lands.</u>'" (quoting *Montana,* 450 U.S. at 565); *id.* at *4 ("*Montana* governs tribal civil jurisdiction over nonmembers on both Indian <u>and non-Indian lands</u>"); *id.* at *6 ("we are bound by our prior precedent holding that *Montana* governs both Indian <u>and non-Indian lands</u>") (emphases added).[19]

Here, the Nation's tribal court complaint alleges injuries to the health, welfare and economic security of the Cherokee Nation and its members that are direct, severe and compelling, indeed, "catastrophic." Unlike *Norton*, where the "claims concern actions that threatened an individual tribal member but do not threaten the tribe as a whole," *id.* at *6, the injuries alleged here result from what can best be characterized as a mass tort caused by the plaintiffs, whose activities, the tribal court complaint alleges, have resulted in an oversupply of opioid drugs and an epidemic of opioid drug abuse in the Nation that has touched thousands of Cherokee citizens and directly resulted in a cascade of tragic consequences.[20]

---

[19]     Nor does *Norton* narrow the application of the *Montana* test by citing *Plains Commerce* for the proposition that the sovereign tribal interests giving rise to *Montana* jurisdiction are confined to "managing tribal land, protecting tribal self-government, and controlling internal relations." *Id.* at *5. The cited *Plains* language just echoes *Montana*'s statement that its two exceptions reflect the inherent "tribal power . . . to protect tribal self-government or to control internal relations . . . ." *Montana*, 450 U.S. at 564. *Plains Commerce* thus mirrors *Montana* and does not narrow it or hold that conduct which otherwise meets one of the *Montana* exceptions requires some additional showing that "tribal governance or internal relations" are also implicated. *See also Latter Day Saints*, 221 F. Supp. 3d at 1324 (citing *Dolgencorp., Inc. v. Miss. Band of Choctaw Indians*, 746 F.3d 167, 175 (5th Cir. 2014), *aff'd sub nom. Dollar Gen. Corp. v. Miss. Band of Choctaw Indians*, 136 S. Ct. 2159 (2016) (per curiam)). To the extent plaintiffs suggest otherwise, *see* Pls.' Mot. at 12, they are wrong.

[20]     Plaintiffs' assertion that there is a *per se* restriction on tribal courts adjudicating tort claims against nonmembers, Pls.' Mot. at 13, is plainly wrong. *Norton* is a tort case, and tribal courts have frequently asserted jurisdiction over tort claims against nonmembers related to conduct that satisfies the *Montana* exceptions. *E.g.*, *Elliott*, 566 F.3d at 844-45 & n.2, 849-50 (negligence and trespass); *Booppanon v. Harrah's Rincon Casino & Resort*, 2007 WL 433250, at *1, *3 (S.D. Cal. 2007) (negligence in hiring and infliction of emotional distress). Indeed, *National Farmers*—the case where the exhaustion doctrine was created—was itself a tort case. 471 U.S. at 847 (seeking pain and suffering damages). Plaintiffs' only contrary authority is *dicta* in a district court case decided on other grounds. *UNC Res., Inc. v. Benally*, 514 F. Supp. 358, 361 (D.N.M. 1981). No

Over the last 15 years, some 433 Cherokees have died from an overdose of prescription opioids. Nimmo Decl. ¶3. In 2015 alone, <u>over 97 million opioid pills</u> were shipped by wholesale distributors and dispensed by pharmacies (including the plaintiffs) in the 14 counties that are wholly or partly included in the Cherokee Nation—approximately 107 opioid pills <u>for every adult</u>, both those who are using opioids and those who are not. *Id.* ¶6. In some of these counties, the 2015 per-adult average for available opioid pills was even higher—as many as 144 pills per adult. *Id.* And the numbers in 2016 were comparable. *Id.* ¶7.

Given this flood of opioid drugs, it is hardly surprising that estimates indicate more than 2,700 Cherokee citizens are currently addicted to opioids.[21] The Nation's Director of Behavioral Health Services separately estimates about 2,800 Cherokee Nation members have an addiction or substance abuse problem involving opioid painkillers, and he "anticipate[s] we will see an increasing number of Cherokee Nation citizens seeking our services for prescription-opioid abuse." Taylor Decl. ¶¶6,7. He states that "[o]pioid abuse in the Cherokee nation impacts our society in so many different ways, it is almost impossible to quantify. . . .[T]he problems associated with opioid abuse and addiction significantly harm the health and welfare of the citizens of Cherokee Nation." *Id.* ¶8.

---

circuit court has agreed with this dicta, *Dolgencorp.*, 746 F.3d at 173 n.3, and the district court itself appears to have abandoned it, *see Cheromiah*, 55 F. Supp. 2d at 1305, 1309 (finding tribe would have jurisdiction over medical malpractice claims arising in the tribe's territory).

[21]    National survey data indicates that of the 318,164 Cherokee citizens who are age 12 or older, 6.9 percent (or 21,953 citizens) use prescription opioids for nonmedical purposes each year, Nimmo Decl. ¶¶8-9, and 12.42 percent of those (or 2,727 citizens) meet the criteria for abuse or dependence. Substance Abuse & Mental Health Servs. Admin., *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables* tbls.1.1A, 5.14A (2016), *available at* https://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH -DetTabs-2015.pdf (showing 12.42 percent of Americans over twelve who misused prescription painkillers in 2015 met the criteria for dependence).

153107-5

And the Nation's Director of Economic Development and Reentry states that this level of addiction has led to "a significant increase in the number of Cherokee Nation citizens exiting the prison system for crimes related to prescription opioid drugs." Legg Decl. ¶8. "Approximately 70 to 80 percent of the crimes that lead to convictions of Cherokee Nation citizens" are drug-related, and "a majority of these drug related crimes are related to opioid pills, including property crimes to get money to buy pills." *Id.* ¶10. "Prescription opioids are widely available on the illegal secondary market within Cherokee Nation as street drugs." *Id.* Mr. Legg states, "I believe that opioid pills is our modern day epidemic of the times we are facing in Cherokee Nation, public enemy number one, at the root of more of the problems I encounter in my work than anything else." *Id.* ¶12. According to an investigator for the Cherokee Nation's Marshall Service, "[p]rescription opioid drug abuse has caused a substantial increase in the amount of thefts, burglaries, assaults, batteries, child abuse/neglect, DWIs, public blight, vagrancy and homelessness, amongst others." Roach Decl. ¶7. And in deaths: "I have also seen a substantial rise in the number of deaths relating to prescription opioid drugs over the last seven years in the Cherokee Nation." *Id.* ¶8. Not surprisingly, "[a]s a result of the increase in prescription opioid related crime and deaths, the Cherokee Nation Marshall Service has been required to divert a significant amount of resources to combat the prescription opioid epidemic." *Id.* ¶9.

The opioid epidemic has taken a particularly heartbreaking toll on Cherokee children. According to the executive director of the Nation's Indian Child Welfare office, there has been "a steady increase" in adults abusing opioid drugs "and whose children, as a result of that drug abuse, have come through the ICW system." Baker-Limore Decl. ¶3. Ms. Baker-Limore has seen "a staggering increase in the number of Cherokee babies born opioid-dependent." *Id.* ¶8. The babies born to mothers who abuse painkillers during pregnancy "suffer significant developmental and

153107-5

cognitive delays." *Id.* ¶9. "In preschool, many of the affected children will suffer from health, cognitive and behavior problems." *Id.* "Many of these babies or children" have to be placed in foster or adoptive homes. *Id.* ¶10. Because the Nation does not have sufficient placement homes to accommodate all of the children harmed by opioid drug abuse, *id.* ¶11, "[m]ore than two-thirds of the Cherokee children who require foster or adoptive care must be placed with non-Cherokee families." *Id.* ¶12. According to Ms. Baker-Limore:

> The placement of the next generation of Cherokee children in non-Cherokee homes is <u>one of the single greatest threats to the Cherokee Nation</u>. These children are raised without learning how to speak the Cherokee language, and without learning the traditions, history, and customs of the Cherokee people, which they cannot pass down to their own children someday.

*Id.* ¶14 (emphasis added).

This proffer just hints at the devastating harms to the Cherokee Nation caused by the epidemic of opioid drugs that, the Nation alleges, has resulted from plaintiffs' illegal activities.[22] What the Nation has suffered is not an injury to a single or to a few tribal members, or the "generalized threat" that torts, in the abstract, "pose for any society." *Norton*, 2017 WL 2952256 at *6 (quoting *Phillip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 943 (9th Cir. 2009)). The injuries alleged here have caused, and continue to cause, catastrophic harms on a mass scale to the Nation and its members. If the second *Montana* exception is to have any meaning at all, it applies here.

> **iii.      Plaintiffs have consensual commercial relationships with the Cherokee Nation and its members, and thus the tribal court has jurisdiction over this case under the <u>Montana</u> 1 analysis.**

---

[22]      By sharp contrast, the case cited by plaintiffs as demonstrating a failure to meet the second *Montana* standard, *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298 (9th Cir. 2013), *see* Pls.' Mot. at 16, involved the alleged environmental harms caused by the building of <u>one house</u> on fee land. The court found the tribe had not shown that this single small construction project posed serious harm to the tribe. 736 F.3d at 1306. This case could not be more different.

A tribe can also exercise jurisdiction under the first *Montana* exception to regulate the activities of nonmembers "who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. Here, there are two different types of "consensual relationships . . . through commercial dealing" between the Cherokee Nation and various plaintiffs: tens of thousands of direct retail transactions between Nation citizens and the pharmacy retailers (Walgreen's, Wal-Mart and CVS), and direct dealings and deliveries between the Nation and the distributors (McKesson and Cardinal).

The plaintiff-retailers themselves concede they are physically located within the Cherokee Nation's jurisdictional area, *e.g.*, Penn Decl. at ¶4 (Walmart); Jordan Decl. ¶4 (CVS), and there is no question that they have engaged in "consensual relationships . . . through commercial dealing" with the members of the Nation—by making millions of dollars of direct sales of pharmaceutical drugs to Cherokee Nation citizens over the past four years. Morton Decl. ¶¶11-13. Walgreens, for instance, has 14 pharmacies located within the Cherokee Nation, and those stores have filled 45,755 prescriptions since May 1, 2013 for participants in the Cherokee Health Plan, the vast majority of whom are members of the Cherokee Nation, at a cost to the Nation of over $4.1 million. *Id.* ¶¶5, 12, 14. Walmart has 15 pharmacies in Cherokee territory and filled 44,224 prescriptions for Cherokee Health Plan members in the same period at a cost to the Nation of over $3.8 million. *Id.* ¶¶13, 15; *see also id.* ¶¶11, 16 (CVS). And the plaintiff-retailers know that they are doing business with Cherokee Nation citizens. *See id.* ¶17.

The knowing and voluntary marketing and selling of products, including pharmaceuticals, to Cherokee Nation citizens by these retailers easily establishes "commercial dealings" with the Nation's citizens sufficient to confer upon the Nation jurisdiction over conduct that has a nexus to those sales. *Cardin v. De La Cruz*, 671 F.2d 363, 364, 366 (9th Cir. 1982) (grocery and general

26

store providing goods to Indian community had consensual relationships with tribe through sales to tribal members).  When a non-Indian business operates within a tribe's territorial jurisdiction and "holds open an invitation to tribal members . . . to patronize that business and they do patronize the business, this may be sufficient to form a consensual relation between the Tribe . . . and that business." *Farmers Union Oil Co. v. Guggolz*, 2008 WL 216321, at *4 (D.S.D. 2008).  Such commercial dealings include retail sales at a gas station and convenience store, *id.* at *1, *5, or the sale and financing of cars at a dealership, *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 590, 593 (9th Cir. 1983).

At the very least, when nonmembers enter consensual commercial relationships with an Indian tribe or its members through the purchase of consumer goods or services, it establishes a "colorable" basis for jurisdiction over the nonmember, and that is all that is needed to require that plaintiffs exhaust their jurisdictional challenges in tribal court.[23]

Unlike the retailers, the plaintiff-distributors insist they are not doing business in this area, Pls.' Mot. at 8-9, relying on *Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.,* 133 F.3d 1087 (8th Cir. 1998).  But in *Hornell*—unlike here—the nonmember company did not <u>distribute</u> its product within the tribe's jurisdiction, and the tribe's only asserted interest in that case was its "cultural interest in conduct occurring outside a reservation."  *Id.* at 1091.  Here, by contrast, the pharmaceutical distributors send their products directly into the Nation's jurisdictional area for

---

[23]     For instance, in *Booppanon*, a nonmember customer at a tribal casino/resort sued the casino management company for claims arising from a commercial transaction.  The court required that her tribal court remedies be exhausted because "[i]t can be plausibly argued that" her purchase of goods or services on the casino was a 'commercial relationship with the Tribe and any disputes arising out of that relationships are subject to tribal court jurisdiction.'"  2007 WL 433250 at *3. *See also Jaramillo v. Harrah's Entm't, Inc*., 2010 WL 653733, at *2 (S.D. Cal. 2010) (tribal jurisdiction over a nonmember patron's lawsuit against a casino management company for injuries suffered in a tribal casino.)

sale. *E.g.*, Potts Decl. ¶15 (Amerisource Bergen) (describing "[a]ll distributions of controlled substances by ABDC into the Cherokee Nation Jurisdictional Area"); Stoy Decl. ¶5(j) (McKesson) (McKesson "provides prescription medications to, *inter alia*, . . . clinics and hospitals affiliated with the Cherokee Nation").[24]

Further, the distributors deal directly with the Nation.  As the Nation's Director of Pharmacy Services states, "In recent years, the majority of the prescription medicine dispensed or administered at Cherokee Nation facilities is supplied by McKesson Corporation."  Sanders Decl. ¶4.  McKesson is a "prime vendor" for the Veterans Administration and for the Indian Health Service, and the Nation, by contract with IHS, purchases its pharmaceuticals from McKesson, through IHS.  *Id.*  McKesson "directly delivers shipments of prescription drugs to Cherokee Nation health facilities . . . ." *Id.* ¶5.  Similarly, "In recent years, a substantial quantity of medical supplies and products used at Cherokee Nation health facilities" has been purchased from Cardinal Health, and delivered to the Nation by Cardinal.  *Id.* ¶6.

In short, the plaintiffs knowingly and voluntarily engage in  "consensual relationships with the tribe or its members, through commercial dealing . . . or other arrangements."  No more is needed for jurisdiction under the first *Montana* exception.

* * * *

---

[24]    This case is thus much closer to *Sprint Communications Co., L.P. v. Wynne*, 121 F. Supp. 3d 893 (D.S.D. 2015), where the court distinguished *Hornell* in the context of a telecommunications company that was located outside a reservation but provided services to persons on the reservation: "when a nonmember begins an activity outside the reservation, the effects of which are directed on to the reservation . . . ." *Id.* at 899 n.5.  The court held that tribal jurisdiction can be asserted over a company that "engage[s] in activities or conduct on the reservation without physically entering a reservation." *Id.* at 900 (emphasis added).  That describes the plaintiff-distributors here.

28

With regard to all of the Nation's jurisdictional claims—both those under the 1866 Treaty and those arising from the Nation's "inherent sovereign power"—what the Tenth Circuit said in *Norton* equally applies here: "We stress that we are not deciding today whether the Tribal Court possesses jurisdiction, but merely whether it can 'make a colorable claim that [it has] jurisdiction.'" 2017 WL 2952256 at *6 (quoting *Thlopthlocco*, 762 F.3d at 1240) (alteration in original). Where, as here, there is such a "colorable claim," the tribal court must have the first chance to decide whether tribal jurisdiction actually exists.[25]

### 2. There is no "express jurisdictional prohibition" on tribal court jurisdiction over this case.

Plaintiffs argue that this case falls within a second exception to the exhaustion requirement because, they claim, the Controlled Substances Act (CSA), 21 U.S.C. §§ 801-904, contains an "express jurisdictional prohibition" against hearing the Nation's claims in tribal court. Pls.' Mot. at 20. Plaintiffs tie this argument to a related claim that any enforcement of the CSA by the Nation in tribal court is preempted by the CSA. *Id.* at 17-19.

Viewed through either lens, there are two fatal problems with this argument. First, it is based on the false premise that the Nation's tribal court case arises under the CSA and that the Nation's lawsuit is an effort to enforce the CSA. It is not. Count I of the tribal court complaint alleges a violation of <u>tribal</u>—not federal—law, the Cherokee Nation Unfair and Deceptive Practices Act, which "prohibits deceptive acts or practices in the conduct of any trade or

---

[25]   For this reason, plaintiffs err in seeking a ruling on the merits of the jurisdictional issue. As another district court in this Circuit said, "Plaintiff's argument regarding the *Montana* rule conflates the questions of exhaustion and jurisdiction.  By arguing that this case falls under neither of the *Montana* exceptions, Plaintiff addresses whether the tribal court has jurisdiction over this case, not whether the tribal court should be permitted to address that question *before* the case is brought in state or federal court.  As the Supreme Court has said, the questions are distinct." *Petrogulf*, 92 F. Supp. 2d at 1117 (citing *Strate v. A-1 Contractors*, 520 U.S. 438, 448 (1997)).

commerce." Tribal Pet. ¶168. The tribal statute provides that a violation of any federal law "affecting or impacting on consumer goods, supplies and services" constitutes a violation of tribal law, and that the CSA is one such law. *Id.* ¶¶172-173. But the cause of action in Count I is a claim arising under <u>tribal</u> law, not an effort to enforce federal law.[26]

None of the remaining counts in the tribal court complaint (nuisance, negligence, unjust enrichment, and civil conspiracy) arises under the CSA either: all are common law tort claims under <u>tribal</u> law, alleging that the plaintiffs failed to adequately control the distribution and dispensing of opioids in the Cherokee Nation, resulting in harms to the Nation and its members. Tort plaintiffs often rely on duties imposed by federal statutes or regulations to establish the applicable standard of care in common law negligence cases, or that violation of a federal regulation is evidence of a breach of duty. This does not mean they are seeking to "enforce" the federal law. *See, e.g., Hull v. Chevron U.S.A., Inc.*, 812 F.2d 584, 589–90 (10th Cir. 1987) (affirming district court's jury instruction that the violation of a federal regulation may be evidence of negligence); *Corporan v. Wal-Mart Stores East, LP*, 2016 WL 3881341, at *5 (D. Kan. 2016) ("to the extent that plaintiff references the [federal Gun Control Act] to define the standard of care—and references a violation of that statute as evidence of breach—[Kansas law] permits that approach."). Thus, even taking plaintiffs' argument at face value, it would at best apply only to one of the five counts in the complaint (and does not even apply to that one).

---

[26]    There is nothing unusual about this kind of statutory provision. It is commonplace for state laws to incorporate federal law standards in defining state law consumer protections. *E.g.* D.C. Code § 28-3904(x) (sale of consumer goods in a condition inconsistent with any requirement of federal law constitutes violation of District of Columbia consumer protection law); Mass. Gen. Laws. ch. 93A, § 2(b) (Massachusetts consumer protection law incorporates Federal Trade Commission Act, 15 U.S.C. §45(a)(1)); Fla. Stat. § 501.204(2) (Florida; same); 815 Ill. Comp. Stat. § 505/2 (Illinois; same).

30

The second problem is that there is no "express" prohibition in the CSA that bars tribal court jurisdiction over the Nation's tribal law claims, nor is there preemption of the tribal law claims. In *Kerr-McGee*, the Tenth Circuit said that "[a] substantial showing must be made by the party seeking to invoke [the express jurisdictional prohibition] exception to the tribal exhaustion rule," and noted that "tribal courts rarely lose the first opportunity to determine jurisdiction because of an 'express jurisdictional prohibition.'" 115 F.3d. at 1502.

The standard here is set by *El Paso Natural Gas Co. v. Netzsosie*, 526 U.S. 473 (1999), where the Supreme Court found that the Price-Anderson Act, 42 U.S.C. ch. 23, which regulates nuclear materials, was the "rare" case, 526 U.S. at 486 n.7, in which there was an "unusual preemption provision," *id.* at 484, that warranted an exception from the tribal court exhaustion requirement. Pointing to express language in the Act that "provides for removal to federal court as of right" for any claim brought under the Act in state court, the Court said that this kind of statute falls under the "complete preemption doctrine" where "the preemptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id.* at 484 n.6. The Court cited only the Labor Management Relations Act and the Employee Retirement Income Security Act (ERISA) as comparably preemptive. *Id.*

The CSA could not be more different. Indeed, that Act has an <u>anti</u>-preemption provision that expressly states it does <u>not</u> occupy the field of drug regulation and control.[27] Thus, for

---

[27]    *See* 21 U.S.C. § 903 ("No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together."); *see also Gonzales v. Oregon,* 546 U.S. 243, 251 (2006) ("The CSA explicitly contemplates a role for the States in regulating controlled substances").

instance, Oklahoma, like many states, has its own comprehensive statute regulating controlled substances, Oklahoma Uniform Controlled Dangerous Substances Act, Okla. Stat. Ann. tit. 63, ch. 2, including regulation of all of the same prescription opioids that form the basis of the Nation's tribal court complaint.[28]  By contrast to the automatic removal provision discussed in *Netzsosie*, the <u>only</u> provision of the CSA that plaintiffs point to as a jurisdictional "prohibition," 21 U.S.C. § 882(a), *see* Pls.' Mot. at 18, is really the opposite of that.  It simply grants injunctive authority to federal district courts ("The district courts . . . shall have jurisdiction in proceedings . . . to enjoin violations . . . .") without making such jurisdiction exclusive, requiring automatic removal of such claims from state court to federal court or divesting any other court of jurisdiction.[29]

Not surprisingly, plaintiffs cite no case in which the CSA has been construed to contain an "express jurisdictional prohibition" for purposes of tribal court exhaustion.  By contrast, all of the cases plaintiffs do cite, *see* Pls.' Mot. at 21 n.11, involve statutes whose language either contains an explicit congressional intent to provide exclusive federal court jurisdiction (which the CSA does not), or that fully preempts any non-federal regulation of the field (which the CSA does not).[30]

---

[28]    *Compare* Pet. ¶53 (referring to codeine, morphine, hydrocodone, oxycodone, fentanyl and methadone) *with* Okla. Stat. Ann. tit. 63 § 2-206(B) (classifying all of the same drugs as Schedule II "controlled substances" subject to regulation under Oklahoma law).  Indeed, Oklahoma has regulated certain drugs even before they were regulated under the CSA.  For instance, Oklahoma listed the opioid tramadol as a Schedule IV drug in 2012, *see* 2012 Okla. Sess. Law Serv. 25, 27 (West), while the federal DEA did not categorize tramadol as such until 2014.  Schedules of Controlled Substances: Placement of Tramadol into Schedule IV, 79 Fed. Reg. 37623 (Jul. 2, 2014).

[29]    Plaintiffs also overstate their point that the CSA can be enforced "only" by the federal government.  Pls.' Mot. at 18.  In the same statutory section cited by plaintiffs, the CSA expressly authorizes civil actions brought by States for money damages or injunctive relief to enforce CSA provisions relating to online pharmacies.  21 U.S.C. § 882(c).

[30]    *Blue Legs v. U.S. BIA*, 867 F.2d 1094, 1098 (8th Cir. 1989) (quoting 42 U.S.C. § 6972(a) (Resource Conservation and Recovery Act)) ("<u>Any</u> action . . . <u>shall be brought</u> in the district court . . .") (emphasis added); *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 460-61 (8th Cir. 1993) (citing 49 U.S.C. §1811(a)(1) (Hazardous Materials

32

The Supreme Court in *Netzsosie* said that where, as here, there is no "express jurisdictional prohibition" (such as an automatic removal requirement), and where plaintiffs are, at best, asserting "a federal preemption defense in the more usual sense," the issue can readily be decided in the first instance by the tribal court: "[T]ribal courts, like state courts, can and do decide questions of federal law, and there is no reason to think that questions of federal preemption are any different." *Netzsosie*, 526 U.S. at 485 n.7. In short, exhaustion of tribal court remedies is required even for plaintiffs' preemption defense.

### 3. There are adequate opportunities in tribal court to adjudicate plaintiff's jurisdictional challenge.

Plaintiffs' third claim for an exception to the exhaustion requirement is that exhaustion will be "futile," Pls.' Mot. at 21, because the Cherokee Nation courts do not provide plaintiffs with the right to an interlocutory appeal of the tribal trial court's jurisdictional determination.

But if plaintiffs are right that they can avoid exhaustion whenever a tribal court process fails to provide for an interlocutory appeal, then the Supreme Court wrongly decided *LaPlante*. There, the Court noted that "[a]lthough the Blackfeet Tribal Code establishes a Court of Appeals . . . it does not allow interlocutory appeals from jurisdictional rulings. Accordingly, appellate review of the Tribal Court's jurisdiction can occur only after a decision on the merits." *LaPlante*, 480 U.S. at 12. The Court nonetheless required exhaustion of tribal court remedies on the

---

Transportation Act)) ("[a]ny requirement of a[n] . . . Indian tribe is preempted . . .") (emphasis added); *Vandever v. Osage Nation Enter., Inc.*, 2009 WL 702776, at *5 (N.D. Okla. 2009) ("ERISA includes expansive preemption provisions which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern.") (internal citation and quotation omitted) (emphasis added); *Sprint Commc'ns Co., L.P. v. Native Am. Telecom, LLC*, 2010 WL 4973319 at *3 (D.S.D. 2010) (Telecommunications Act) ("the regulation of interstate tariffs is governed exclusively by federal law") (emphasis added). *But see Wynne*, 121 F. Supp. 3d at 902-03 (exhaustion of tribal court remedies not preempted by Telecommunications Act); *AT&T Corp. v. Oglala Sioux Tribe Util. Comm'n*, 2015 WL 5684937 (D.S.D. 2015) (same).

153107-5

jurisdictional issue. *Id.* at 17 (further noting that "[u]ntil appellate review is complete," the tribal courts "have not had a full opportunity to evaluate the claim and federal courts should not intervene." (emphasis added)).[31]

Plaintiffs also raise a variety of additional due process complaints about Cherokee Nation law: (1) that they are being sued for past conduct under a statute that was only recently enacted, (2) that they are being sued by the Cherokee Nation Attorney General in a *parens patriae* capacity, (3) that they face "allegedly limitless damages" because there is a statutory penalty of $10,000 per violation, and (4) that there is no statute of limitations for these claims under the Cherokee Nation code. *See* Pls.' Mot. at 22, 24-25.

Even if plaintiffs' complaints were valid (and they are not), they would not justify an exception to the exhaustion requirement. *LaPlante,* 480 U.S. at 18-19 (rejecting claim of tribal court "bias and incompetence" as basis for an exception to exhaustion). Moreover, all of plaintiffs' objections are directed to provisions of Cherokee law that are commonly found in comparable state law statutes. First, a legislature can impose retroactive remedies for a host of reasons, including when it wants to give "comprehensive effect to a new law [it] considers salutary." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267-68 (1994).[32] Courts determine whether a statute is to be

---

[31]    The district court in *Encana* also rejected this argument, even after two years of litigation in tribal court and an adverse tribal trial court ruling on the jurisdictional question. Encana Oil sought federal court review of the jurisdictional ruling. But, as in *LaPlante*, the tribal code "only gives the [tribal appellate court] jurisdiction to hear appeals from final orders or judgments. . . ." 2012 WL 12551492 at *3 n.4. Despite the absence of any interlocutory appeal right, the federal court denied Encana's motion for a preliminary injunction. *Id.* at *9; *see also Marathon Oil Co. v. Johnston*, 2004 WL 4960751, at *3-4 (D. Wyo. 2004) (tribal court failure to provide interlocutory appeal does not excuse exhaustion).

[32]    The Nation's recent enactment of a consumer protection statute is just such a "salutary" law, similar to state acts regulating the same conduct. *Compare* Cherokee Nation Deceptive & Unfair Trade Practices Act, § 25(A) (prohibiting deceptive acts or practices in the conduct of any trade or commerce) *with* Okla. Stat. Ann. tit. 15, §§ 752(13)-(14), 753(20) (prohibiting "unfair or

153107-5

applied retroactively in light of the rights purportedly at stake and how the statute affects those rights, *id.* at 267-68, 280; *see Daniels v. United States*, 254 F.3d 1180, 1187-88 (10th Cir. 2001). For a tribal law, this retroactivity analysis is best done in tribal court, *see CDST-Gaming I, LLC v. Comanche Nation, Okla.*, 2009 WL 10668664, at *4-5 (W.D. Okla. 2009), and it is sheer speculation for plaintiffs to presume to know how the tribal court here will decide the question. Second, the Cherokee statute's *parens patriae* provision is no different than, *e.g.*, the Oklahoma and Arkansas consumer protection statutes, which allow for each State's Attorney General to bring a civil enforcement action on behalf of the public. Ark. Code Ann. § 4-88-113(a); Okla. Stat. Ann. tit. 15, § 756.1(A). Third, Oklahoma and Arkansas law, like Cherokee law, allow for penalties of up to $10,000 per violation of their respective state Consumer Protection Act. Ark. Code Ann. § 4-88-113(a)(3); Okla. Stat. Ann. tit. 15, § 761.1(C). Lastly, several States, including Oklahoma, follow the doctrine that statutes of limitations do not apply to the State when suing to vindicate public rights.[33] In short, the provisions of Cherokee law that plaintiffs complain about are far from unusual.

## II.     PLAINTIFFS HAVE NOT SHOWN THEY WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS DENIED.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Charles Alan Wright, et al., 11A *Fed. Prac. & Proc.:*

---

deceptive trade practice[s]," including "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers").

[33]     *See, e.g.*, *Okla. City Mun. Improvement Auth. v. HTB, Inc.*, 769 P.2d 131, 134 (Okla. 1998) ("statutes of limitation shall not bar suit by any government entity acting in its sovereign capacity to vindicate public rights"); *see also People ex rel. Dep't of Pub. Aid v. Dent*, 614 N.E.2d 376, 378 (Ill. App. Ct. 1993) ("There is a doctrine of governmental immunity from statutes of limitations.").

153107-5

Civ. § 2948.1 (3d ed. 2017 update).  Irreparable injury for a preliminary injunction "must be both certain and great," not "merely serious or substantial."  *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (10th Cir. 2001).  A failure to show irreparable injury relieves the court from even examining the other three standards for the grant of a preliminary injunction.  *See Franks v. Nimmo*, 683 F.2d 1290, 1293 (10th Cir. 1982); *Dish Network*, 725 F.3d at 882 ("[T]he absence of irreparable injury is by itself sufficient to defeat a motion for a preliminary injunction . . . .").

Plaintiffs here assert that their "irreparable" injury lies primarily in the inconvenience and expense of having to litigate their jurisdictional challenge in the tribal forum first.  But such litigation costs are not even economic injury, much less irreparable harm. The Supreme Court has stated that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercroft Clothing Co.*, 415 U.S. 1, 24 (1974); *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980).  Similarly, in the context of deciding whether to enjoin a state court proceeding, the Tenth Circuit noted that "the cost, anxiety, and inconvenience" of having to litigate in the state court "is not enough to establish the 'great and immediate' threat of irreparable injury necessary to justify enjoining pending state proceedings." *Phelps v. Hamilton*, 59 F.3d 1058, 1065 (10th Cir. 1995); *see also Briggs & Stratton Corp. v. Local 232, Int'l Union*, 36 F.3d 712, 714 (7th Cir. 1994) ("It is, after all, established that the costs of litigation are not 'irreparable injury.'").  Indeed, if the costs of litigating in tribal court constituted "irreparable harm" sufficient to enjoin a tribal court proceeding, there would be nothing left to the *National Farmers* exhaustion doctrine.

Plaintiffs argue that litigation costs are a cognizable harm when the litigation is in a court without jurisdiction. Pls.' Mot. at 22-23.  But that argument assumes its conclusion.  When the

36

*National Farmers* doctrine requires a tribal court to adjudge any challenge to its jurisdiction first, plaintiffs are by definition not being forced to litigate in the "wrong" court. To the contrary, exhausting one's tribal court remedy "is the proper exercise of federal law, not the unlawful exercise of tribal jurisdiction . . . ." *Encana*, 2012 WL 12551492, at *9.[34]

Plaintiffs also rely on *Crowe* to argue that their economic harm may be irreparable because "sovereign immunity may prevent future remedy." Pls.' Mot. at 22. But that argument fails to acknowledge the fundamental differences between the harm recognized in *Crowe* and the very different harm alleged here. In *Crowe* the law firm was the subject of a collateral tribal court order directing it (as a non-party) to immediately repay attorneys' fees it had already received for work it had already completed. 640 F.3d at 1145-46. As the Tenth Circuit noted, the law firm would be left with no practical remedy to recover its fees, once repaid, if the opposing tribal faction was ultimately recognized as the legitimate tribal government: it would be "highly unlikely" that the tribal government controlled by the hostile faction would "voluntarily return funds to Crowe," and the tribal government "would be immune from suit" in any litigation brought by Crowe to recover its fees. *Id.* at 1157-58. Thus, "[i]n the unique circumstances of this case," the law firm faced a "significant risk of financial injury arising from irrecoverable attorneys' fees." *Id.* at 1158. But the Tenth Circuit's concern was about the attorneys' fees that would have to be repaid under the tribal court's collateral order, not the fees that would be incurred in exhausting the law firm's tribal

---

[34]    This is also the response to the narrow class of cases plaintiffs cite where courts found economic harm constituted irreparable injury when the courts had <u>already</u> concluded that tribal jurisdiction was plainly lacking. *See Kerr-McGee Corp. v. Farley*, 88 F. Supp. 2d 1219, 1232-33 (D.N.M. 2000); *Chiwewe v. Burlington N. & Santa Fe Ry. Co.*, 2002 WL 31924768, at *2 (D.N.M. 2002).

153107-5

court remedies.  The Court never held that the law firm's "time, money, and effort in litigating before the tribal court" constituted irreparable harm.  *Id.* at 1158 n.10.

This case is nothing like *Crowe*.  Even assuming the tribal court here finds that it has jurisdiction over the plaintiffs, and even further assuming that there are subsequent merits proceedings that result in a tribal court judgment for money damages against the companies, the tribal court's jurisdictional ruling would then be fully reviewable in federal court before the companies would have to pay anything under the judgment.[35]  Unlike *Crowe*, the companies here face <u>no</u> risk of "the [i]mposition of money damages that cannot later be recovered for reasons such as sovereign immunity," *id.* at 1157 (internal quotation omitted) (alteration in original), and the companies will not have to pay one cent in damages until this federal Court completes its review of the ultimate jurisdictional determination made in the tribal court.

## III.    THE CHEROKEE NATION WOULD BE INJURED BY THE GRANT OF A PRELIMINARY INJUNCTION.

Plaintiffs assert the time and expense they may incur in litigating in tribal court far outweigh what they call the "potential inconvenience to the Tribe . . . ."  Pls.' Mot. at 23.  But the Nation's injury is not mere "inconvenience;" it is an injury to the Nation's ability as a sovereign government to protect tribal members from harm by enforcing its own laws in its own courts.  It is also an injury to the tribal court system as a whole that would, by the proposed injunction, be

---

[35]    *See LaPlante*, 480 U.S. at 19 (tribal court's determination on jurisdiction is "ultimately subject to review" in federal court after "available tribal remedies" have been exhausted); *Thlopthlocco*, 762 F.3d at 1241 (federal action can be abated until exhaustion of tribal remedies occurs).  For this same reason, the *Benally* cases cited by plaintiffs are inapposite.  There, the Court found that an injunction was warranted because UNC would have "no avenue of appeal or other recourse to another forum" if the injunction was denied.  *UNC Res., Inc. v. Benally*, 518 F. Supp. 1046, 1053 (D. Ariz. 1981); *see also Benally*, 514 F. Supp. at 363.  Quite the opposite is the case here.

preempted from assessing even its own jurisdiction. These are grave injuries not to be taken lightly.

"Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination." *Nat'l Farmers*, 471 U.S. at 856. "Tribal courts play a vital role in tribal self-government, and the Federal government has consistently encouraged their development." *LaPlante*, 480 U.S. at 14-15 (citation omitted). "A federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts . . . ." *Id.*

Plaintiffs' argue that this injury is minimal because the Nation can file its claims in federal court. Pls.' Mot. at 23. Not so. The Cherokee Nation is not bringing claims under federal or state law—it is asserting <u>tribal</u> law claims, a point which plaintiffs repeatedly ignore or mischaracterize. Without claims arising under federal law, a federal forum is foreclosed. *See Kaw Nation ex rel. McCauley v. Lujan*, 378 F.3d 1139, 1143 (10th Cir. 2004) (federal courts have no jurisdiction over disputes regarding the meaning of tribal law). More importantly, even if another forum were available for the Nation's claims, that would not eliminate the harm suffered by the Cherokee Nation as a sovereign in being precluded from enforcing its own laws in its own courts. "Congress has enunciated a strong interest in promoting tribal sovereignty, including the development of tribal courts." *Smith v. Moffett*, 947 F.2d 442, 444 (10th Cir. 1991). Plaintiffs' concern about their legal fees—fees, after all, to be borne by some of the wealthiest corporations in America—is heavily outweighed by the incalculable injury to the Cherokee Nation's sovereignty interests that would be suffered by enjoining a tribal court proceeding before that court can even examine its own jurisdiction in the first instance.

## IV.    A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST.

For much the same reason, a preliminary injunction would disserve the public interest, which is best expressed by the longstanding congressional policy of supporting the exercise of tribal self-government through active tribal courts.  *See Nat'l Farmers*, 471 U.S. at 856; *LaPlante*, 480 U.S. at 14-15 & n.5 (citing federal statutes embodying this policy); *Moffett*, 947 F.2d at 444. The *National Farmers* exhaustion doctrine not only "further[s] the congressional policy of supporting tribal self-government" and "promote[s] the orderly administration of justice," but it also allows the federal courts "to obtain the benefits of tribal expertise." *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1377-78 (10th Cir. 1993) (citation omitted).  All of these policies squarely serve the public interest, and all will be impaired by the issuance of a preliminary injunction.

Plaintiffs' contrary arguments fail to respect the importance of tribal court jurisdiction.  *See Moffett*, 947 F.2d at 444-45 (the fact there are non-Indians litigants is "immaterial" to concerns of comity and tribal sovereignty that compel tribal exhaustion).  To the extent plaintiffs believe any of their rights are violated in tribal court, they will have the opportunity to seek review from a federal court <u>after</u> such remedies have been exhausted.  *LaPlante*, 480 U.S. at 19.  In short, plaintiffs' improperly conflate their own parochial litigation interests with the "public interest," and they fail to credit the weighty public interest inherent in the promotion of tribal sovereignty, including support for tribal courts, that has been repeatedly recognized by both Congress and the Supreme Court and that would be directly impaired by the grant of a preliminary injunction.

## V.    CONCLUSION

The plaintiff's motion for a preliminary injunction should be denied.

153107-5

Respectfully Submitted,


/s/ Lloyd B. Miller
Lloyd B. Miller
Donald J. Simon
Frank S. Holleman
Rebecca A. Patterson
SONOSKY, CHAMBERS, SACHSE,
   ENDRESON & PERRY, LLP
1425 K Street NW, Suite 600
Washington, D.C. 20005
loyd@sonosky.net
dsimon@sonosky.com
fholleman@sonosky.com
rebecca@sonosky.net
Tel.: (202) 682-0240

M. Todd Hembree
Attorney General
Chrissi Ross Nimmo
John Young
Chad Harsha
Assistant Attorneys General
THE CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74464

William S. Ohlemeyer
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
wohlemeyer@bsfllp.com
Tel: (914) 749-8440

Stephen N. Zack
Tyler Ulrich
Patricia A. Melville
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street Suite 2800
Miami, Florida 33131
szack@bsfllp.com
tulrich@bsfllp.com
pmclville@bsfllp.com
Tel: (305) 539-8400
Fax: (305) 539-1307

41

153107-5

Richard Fields
FIELDS LAW PLLC
2000 Massachusetts Ave
Washington, D.C. 20036
fields@fieldslawpllc.com
Tel: (917) 297-3610

Curtis "Muskrat" Bruehl
THE BRUEHL FIRM
3216 NW 177th St.
Edmond, OK 73012
cbruehl@bruehllaw.com
Tel.: (405) 509-6300

ATTORNEYS FOR DEFENDANT
ATTORNEY GENERAL TODD
HEMBREE

July 21, 2017

153107-5

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2017, I electronically transmitted the foregoing document to the Clerk of the Court using ECF system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Stuart Paul Ashworth | D Michael McBride, III |
| Stuart Douglas Campbell | Larry D. Ottaway |
| Jane Reed Cowdery | James John Proszek |
| Don William Danz | Ryan A. Ray |
| Alvin L. Emch | Richard Schirtzer |
| Steven Ernest Holden | G. Calvin Sharpe |
| Joey Dean Horton | Amy Sherry-Fischer |
| Susan E. Huntsman | Amy Durrell White |
| Kaylee Patricia Davis-Maddy | Joel L. Wohlgemuth |
| Claire E. Castles | Frank Lane Heard |
| Karen P. Hewitt | Steven M. Pyser |
| Meredith S. Auten | Matthew Benov |
| A. Lauren Carpenter | Lauren Jane Durfee |
| Thomas F. Gede | Steven R. Hickman |

And I hereby certify that on July 21, 2017, I served the foregoing document by email on the following who are not registered participants of the ECF program:

Geoffrey Hobart
Covington & Burling LLP
850 TENTH ST NW
WASHINGTON, DC 20001
ghobart@cov.com

Russell D Jessee
Steptoe & Johnson PLLC (Charleston)
PO BOX 1588
CHARLESTON, WV 25326-1588
russell.jessee@steptoe-johnson.com

Enu Mainigi
Williams & Connolly
725 TWELFTH ST NW
WASHINGTON, DC 20005
emainigi@wc.com

/s/ Lloyd B. Miller
Lloyd B. Miller

153107-5