**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MCKESSON CORPORATION;** | ) |
| **CARDINAL HEALTH, INC.;** | ) |
| **AMERISOURCEBERGEN DRUG** | ) |
| **CORPORATION; CVS HEALTH** | ) |
| **CORPORATION; WALGREENS** | ) |
| **BOOTS ALLIANCE, INC.; and** | ) |
| **WAL-MART STORES, INC.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Case. No. 17-CV-323-TCK-FHM** |
| | ) |
| **TODD HEMBREE, ATTORNEY** | ) |
| **GENERAL OF THE CHEROKEE** | ) |
| **NATION, in his official capacity;** | ) |
| **JUDGE CRYSTAL R. JACKSON, in** | ) |
| **her official capacity; DOE JUDICIAL** | ) |
| **OFFICERS 1-5; and JUDGE T. LUKE** | ) |
| **BARTEAUX,** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Preliminary Injunction and Brief in Support ("Motion") (Doc. 13).

## I.  Introduction

It is undisputed that this nation is in the midst of an opioid crisis. Drug overdose deaths and opioid-involved deaths continue to increase in the United States, and the President of the United States has declared the opioid epidemic a national public health emergency. The latest figures from the Centers for Disease Control and Prevention show that from 2000 to 2016, more than half a million people died from drug overdoses. The majority of these drug overdose deaths (more than six out of ten) involved an opioid and 40% of all U.S. opioid overdose deaths involve a prescription

1

opioid. Ninety-one Americans die every day from an opioid overdose. Overdose deaths involving prescription opioids were five times higher in 2016 than in 1999, and sales of these prescription drugs have quadrupled. Misuse, abuse, and opioid use disorder (addiction) rates are also skyrocketing. In 2014, almost two million Americans abused or were dependent on prescription opioids. Every day, more than one thousand people are treated in emergency departments for misusing prescription opioids. These statistics suggest an escalating economic and public health burden with enormous consequences for our society.

Oklahoma is among the states with the highest number of opioid prescriptions per one hundred people and has a high overdose death rate. Tribal communities have been tragically affected, as have other communities in Oklahoma. Numerous cities, counties and states throughout the country, including the state of Oklahoma, have filed lawsuits against various opioid manufactures, pharmaceutical distributors, and other businesses allegedly responsible for the proliferation of opioid drugs. This proceeding concerns a lawsuit by the Cherokee Nation against a number of opioid distributors and pharmacies. However, the question before the Court is not the merits of the Cherokee Nation's lawsuit but rather the boundaries of tribal court jurisdiction. The Attorney General of the Cherokee Nation has filed suit not in state court but in the tribal district court of the Cherokee Nation. Do the tribal courts of the Cherokee Nation have jurisdiction over this particular action? The Court finds they do not.

## II.    Background

In 2016, the Cherokee Nation legislatively enacted the Cherokee Nation Unfair and Deceptive Practices Act, CHEROKEE NATION CODE ANN. tit. 12, §§ 21-28 (2016) ("CNUDPA"), which prohibits "deceptive acts or practices" in the conduct of trade or commerce in the Cherokee

Nation. The CNUDPA is part of the Cherokee Nation's Comprehensive Access to Justice Act of 2016 ("CAJA"), which amended portions of the Civil Procedure section of the Cherokee Nation Code. *See id.* at tit. 12, §§ 1 et seq. Among other things, the CAJA permits the Cherokee Nation to bring civil actions as *parens patriae* on behalf of tribal members for violations of CNUDPA and enables the Cherokee Nation to recover treble damages in such actions. *See id.* at tit. 12, § 13. The CAJA also eliminates the statute of limitations when the Cherokee Nation is a party plaintiff. *See id.* at tit. 12, § 11.

On April 20, 2017, the Cherokee Nation filed suit in the District Court for the Cherokee Nation against six corporations, comprising three pharmacies –CVS, Walgreens, and Wal-Mart (the "Pharmacies"); and three pharmaceutical wholesale distributors–McKesson, Cardinal Health, and AmerisourceBergen (the "Distributors").[1] In that proceeding, *Cherokee Nation v. McKesson Corp., et al.*, Docket No. CV-2017-203 (the "Tribal Court Action"), the Cherokee Nation asserts claims under CNUDPA and common law claims for nuisance, negligence, unjust enrichment, and civil conspiracy against all six defendants. The petition in the Tribal Court Action (the "Tribal Court Petition") alleges that the Pharmacies and Distributors knowingly or negligently distributed and dispensed prescription opioid drugs within the Cherokee Nation in a manner that foreseeably injured, and continues to injure, the Cherokee Nation and its citizens. All of the claims in the Tribal Court Petition are brought both "in [the Cherokee Nation's] proprietary capacity and under its *parens patriae* authority in the public interest," as provided in the CAJA. (Trib. Ct. First Am. Pet.

---

[1] Plaintiffs dispute that the proper entities have been named in the original Tribal Court Petition (which subsequently has been amended). For the purpose of Plaintiffs' motion for preliminary injunction, the Court will proceed as though the proper entities are named, without deciding as such.

¶ 11.) The Tribal Court Petition seeks injunctive relief, imposition of civil penalties, compensatory and punitive damages, restitution, and disgorgement, among other relief.

The Distributors and Pharmacies (collectively, "Plaintiffs") filed this action against Defendants Todd Hembree ("Hembree"), Attorney General of the Cherokee Nation, in his official capacity; Judge Crystal R. Jackson ("Judge Jackson"), in her official capacity; Judge T. Luke Barteaux ("Judge Barteaux"), in his official capacity; and Doe Judicial Officers 1-4 (collectively, "Defendants").[2] Plaintiffs' Complaint (Doc. 2) seek a declaratory judgment that Defendants lack jurisdiction to prosecute and hear the Tribal Court Action, among other relief. Plaintiffs' Motion seeks a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 enjoining Defendants from taking any action in the Tribal Court Action.[3] Hembree filed a response in opposition to Plaintiffs' Motion (Doc. 86) in addition to several supplemental filings ordered or permitted by the Court. Judge Jackson and Judge Barteaux jointly filed a response opposing the Motion (Doc. 95).

## III. Standard for Preliminary Injunction

The "primary goal of a preliminary injunction is to preserve the pre-trial status quo" before a trial on the merits. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). To obtain a preliminary injunction, the movant has the burden to show that: (1) the movant is substantially

---

[2] Judge Barteaux is assigned to hear the Tribal Court Action in the District Court of the Cherokee Nation. In their joint response, Judge Barteaux and Judge Jackson assert that Judge Jackson has no connection to the case and should be dismissed. However, Judge Jackson has not filed a motion according to the Court's local rules seeking to be dismissed from this action.

[3] In *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011), the Tenth Circuit held that *Ex parte Young*, 239 U.S. 123 (1908), confers authority on the federal courts to enjoin the unlawful exercise of tribal court jurisdiction, and that tribal officials sued in their official capacity are not subject to sovereign immunity in that context. *Crowe & Dunlevy*, 640 F.3d at 1154. Defendants do not assert tribal sovereign immunity in this proceeding.

likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017) (citing *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation marks omitted).

## IV. Whether Plaintiffs Are Substantially Likely to Succeed on the Merits

In this proceeding, Plaintiffs seek a declaration that the Cherokee Nation lacks jurisdiction in the Tribal Court Action. Therefore, Plaintiffs' likelihood of success hinges on their ability to show that the tribal court lacks jurisdiction. "It is well settled that 'the scope of a tribal court's jurisdiction is a federal question over which federal district courts have jurisdiction.'" *United Planners Fin. Servs. of Am., L.P. v. Sac and Fox Nation*, No. CIV-14-1278-HE, 2015 WL 3756181, at *3 (W.D. Okla. June 16, 2015) (quoting *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1201 (10th Cir. 1997)) (internal citation omitted). Plaintiffs also must show that they should not be required to exhaust their remedies in the Tribal Court Action before challenging the tribal court's jurisdiction in federal court. *See Crowe & Dunlevy*, 640 F.3d at 1149 ("[A]bsent exceptional circumstances, federal courts typically 'should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted.'") (quoting *Bank of Okla. v. Muskogee (Creek) Nation*, 972 F.2d 1166, 1170 (10th Cir. 1992)).

## A.       Tribal Court Jurisdiction Generally

Courts recognize Indian tribes as "distinct, independent political communities, qualified to exercise many of the powers and prerogatives of self-government." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008) (internal quotation omitted). However, "the sovereignty that the Indian tribes retain is of a unique and limited character[,]" and "centers on the land held by the tribe and on tribal members within the reservation." *Id.* (internal quotation omitted). "By virtue of their incorporation into the United States, [a] tribe's sovereign interests are now confined to managing tribal land, protecting tribal self-government, and controlling internal relations." *Id.* at 334 (internal quotations and citations omitted).

In *Montana v. United States*, 450 U.S. 544, 565 (1981), the Supreme Court held that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Accordingly, "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are presumptively invalid." *Plains Commerce Bank*, 554 U.S. at 330 (quotation omitted) (citing *Atkinson Trading Co. v. Shirley*, 532 U.S. 656 (2001)). "[A]bsent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." *Strate v. A-1 Contractors*, 520 U.S. 436, 445 (1997).

The *Montana* rule is subject to two exceptions. *Norton v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 862 F.3d 1236, 1243 (10th Cir. 2017). First,

> [a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements.

*Montana*, 450 U.S. at 565 (internal citations omitted). Second,

> [a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has

some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Id.* at 566 (internal citations omitted). The party seeking to assert tribal court jurisdiction bears the burden of showing that one of the *Montana* exceptions applies. *Plains Commerce Bank*, 554 U.S. at 330.

The *Montana* exceptions are "limited . . . and cannot be construed in a manner that would swallow the rule or severely shrink it." *Id.* at 330 (internal quotation and citations omitted). In particular, the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana*, 450 U.S. at 564. Furthermore, a "tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," and tribal courts therefore are "not courts of general jurisdiction." *Crowe & Dunlevy*, 640 F.3d at 1151 (internal quotation omitted).

Despite the "presumption against tribal civil jurisdiction over non-Indians," *id.* at 1150, Defendants contend that Plaintiffs are required to exhaust their jurisdictional challenge in the tribal court before challenging the tribal court's jurisdiction in federal court. Under the exhaustion rule, "the federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a 'full opportunity to determine its own jurisdiction.'" *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) (quoting *Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 855-56 (1985)); *see also id.* at 15-16 ("Promotion of tribal self-government and self-determination require[] that the Tribal Court have the first opportunity to evaluate the factual and legal bases for the challenge to its jurisdiction.") (quotation omitted)).

The exhaustion rule is not jurisdictional but is "a prudential rule based on comity." *Crowe & Dunlevy*, 640 F.3d at 1150. The Tenth Circuit recognizes several exceptions that may excuse the failure to exhaust claims in tribal court:

> (1) where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) where the action is patently violative of express jurisdictional prohibitions; . . . (3) where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction; [and] (4) where it is clear that the tribal court lacks jurisdiction and that judicial proceedings would serve no purpose other than delay.

*Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1238 (10th Cir. 2014) (internal quotations and citations omitted).

A party seeking to avoid exhaustion must "make a substantial showing of eligibility" that one of the exceptions applies. *Kerr-McGee Corp.*, 115 F.3d at 1502. The exceptions to the exhaustion rule "typically will not apply so long as tribal courts can 'make a colorable claim that they have jurisdiction.'" *Norton*, 862 F.3d at 1243 (quoting *Thlopthlocco Tribal Town*, 762 F.3d at 1240). However, the exceptions "generally apply if tribal court jurisdiction is 'automatically foreclosed,'" *id.* (quoting *Nat'l Farmers*, 471 U.S. at 855), such as "where the federal court has exclusive jurisdiction or where tribal jurisdiction is foreclosed by sovereign immunity," *Kerr-McGee Corp.*, 115 F.3d at 1502.

## B. Analysis

Plaintiffs contend that jurisdiction in the Tribal Court Action is automatically foreclosed, and therefore requiring Plaintiffs to exhaust their jurisdictional challenge through the tribal courts would serve no purpose other than delay. Plaintiffs argue, alternatively, that the Cherokee Nation's claims are expressly prohibited as an unauthorized attempt to privately enforce the federal Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-904, and that exhaustion would be futile because

Plaintiffs would be forced to defend the Cherokee Nation's claims on the merits through the tribal court system before federal court review.

The Court will first address the Cherokee Nation's claims under CNUDPA and then its common law claims to determine whether there is a colorable claim of tribal jurisdiction over any of the claims in the Tribal Court Action.  *See Norton*, 862 F.3d at 1245 (citing *Attorney's Process & Investig. Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 937 (8th Cir. 2010)) ("Each claim must be analyzed individually in terms of the *Montana* principles to determine whether the tribal court has subject matter jurisdiction over it.").

### 1.    CNUDPA Claims

Count I of the Tribal Court Petition alleges violations of CNUDPA, the 2016 tribal act that "prohibits deceptive acts or practices in the conduct of any trade or commerce," including any violation of the federal CSA.  (Trib. Ct. First Am. Pet. ¶¶ 168, 172-73.)  Count I alleges that the Distributors and Pharmacies "categorically violate[d]" CNUDPA by conduct that violates the CSA, *id.* at ¶¶ 176-77), specifically:  "[f]illing suspicious or invalid orders for prescription opioids . . . ; [f]ailing to maintain effective controls against opioid diversion; [f]ailing to operate an effective system to disclose suspicious orders of controlled substances; [f]ailing to reasonably maintain necessary records of opioid transactions; and [d]eliberately ignoring questionable and/or obviously invalid prescriptions and filling them anyway."  (*Id.* at ¶ 178.)

Plaintiffs contend the CNUDPA claims amount to an attempt to privately enforce the federal CSA.  The CSA does not provide a private right of action.  Instead, it delegates the power of enforcement of federal drug policy to the federal government.  *See Smith v. Hickenlooper*, 164 F. Supp. 3d 1286, 1290 (D. Colo. 2016) ("[F]ederal courts have uniformly held that the CSA does not create a private right of action. . . . [A]ccording to its plain terms, '[t]he [CSA] is a statute

enforceable only by the Attorney General and, by delegation, the Department of Justice.'") (internal citation omitted)). Hembree argues in circular fashion that the Tribal Court Petition seeks to enforce tribal law, not federal law, because the CNUDPA prohibits any violation of the CSA. However, courts have rejected private attempts to enforce the CSA through other vehicles. *See, e.g., Jones v. Hobbs*, 745 F. Supp. 2d 886, 890-94 (E.D. Ark. 2010), *aff'd*, 658 F.3d 842 (8th Cir. 2011) ("Congress created two elaborate statutory schemes, the [Food, Drug and Cosmetic Act] and the [CSA] . . . . In both statutory schemes, Congress defined the scope of jurisdiction granted to the district courts, and in neither instance did Congress include within the jurisdiction of district courts the authority to entertain causes of action brought by private individuals to enforce the statutes. Congress, instead, provided for enforcement of both the FDCA and the CSA by the executive branch."); *Hatfield v. Arbor Springs Health and Rehab Center*, No. 3-12CV528-MHT, 2012 WL 4476612, at *3 (M.D. Ala. Sept. 4, 2012) ("The Controlled Substances Act does not create the wrongful termination claim that plaintiff asserts in this action. The provisions of the Act on which plaintiff relies do not provide expressly for a private civil cause of action, nor does the Act imply a private right of action.").

Hembree contends the Cherokee Nation may incorporate the CSA into its own legislation because the CSA expressly allows states to regulate controlled substances. *See* 21 U.S.C. § 903 ("No provision of [the CSA] shall be construed as indicating an intent on the part of Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State . . . ."). However, unlike states, tribes do not have courts of general jurisdiction. *Crowe & Dunlevy*, 640 F.3d at 1151 (10th Cir. 2011) ("Tribal courts, it should be clear, cannot be courts of general jurisdiction . . . , for a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as

broad as its legislative jurisdiction." (quoting *Nevada v. Hicks*, 533 U.S. 353, 367 (2001))). Defendants have cited no provision of the CSA that would provide a tribal court with jurisdiction of a claim asserting rights created by the CSA, even if such a claim were permissible. As in *Hicks*, where the Supreme Court held a tribal court lacked jurisdiction over civil rights claims under 42 U.S.C. § 1983, there is "no provision in federal law provid[ing] for tribal-court jurisdiction" over an action purporting to enforce the CSA. *Hicks*, 533 U.S. at 367-68 (noting, in contrast, federal statutes providing tribal court jurisdiction over child custody disputes under the Indian Child Welfare Act of 1978 and over mortgage foreclosure actions brought by the Secretary of Housing and Urban Development against reservation homeowners).

For these reasons, the Court finds that tribal court jurisdiction over Count I of the Tribal Court Petition is foreclosed as an unauthorized attempt to privately enforce the CSA. Further, in light of the Plaintiffs' nonmember status, the lack of authorization for tribal enforcement in the CSA or elsewhere, and clearly established authority that the CSA does not authorize a private right of action, the Court finds that the lack of tribal court jurisdiction over Count I is "so patently obvious as to defy exhaustion." *Thlopthlocco Tribal Town*, 762 F.3d at 1239. Accordingly, Plaintiffs are not required to exhaust their arguments in tribal court with respect to the CNUDPA claims. To require otherwise "would serve no purpose other than delay." *Id.* at 1238.

### 2. Common-Law Claims

The Tribal Court Petition asserts common-law claims of nuisance, negligence, unjust enrichment, and civil conspiracy against all defendants. Plaintiffs contend, first, that tribal jurisdiction is automatically foreclosed because none of the conduct at issue occurred within Indian

country.[4]  It is undisputed that the Distributors' and Pharmacies' facilities are not located on land

owned by or held in trust for the Cherokee Nation.  However, because *Montana* governs jurisdiction

over nonmembers even within Indian country, the Court will determine first whether there is a

colorable claim of jurisdiction under either the first or second *Montana* exception.

### a.  First *Montana* Exception

The first *Montana* exception permits tribes to regulate certain "activities of nonmembers who

enter consensual relationships with the tribe or its members, through commercial dealing, contracts,

leases, or other arrangements."  *Montana*, 450 U.S. at 565.  However, a tribe's sovereign interest

over nonmember conduct on non-Indian fee land is limited because "[b]y definition, fee land owned

by nonmembers has already been removed from the tribe's immediate control."  *Plains Commerce*

*Bank*, 554 U.S. at 336.  Underlying this principle is the fact that tribal sovereignty exists "outside

the basic structure of the Constitution[,] [t]he Bill of Rights does not apply to Indian tribes[,] [a]nd

nonmembers have no part in tribal government . . . ."  *Id.* at 337.  Because nonmembers "have no

say in the laws and regulations that govern tribal territory[,] . . . those laws and regulations may be

---

[4]  "Indian country" is defined as follows:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the
> United States Government, notwithstanding the issuance of any patent, and,
> including rights-of-way running through the reservation, (b) all dependent Indian
> communities within the borders of the United States whether within the original
> or subsequently acquired territory thereof, and whether within or without the
> limits of a state, and (c) all Indian allotments, the Indian titles to which have not
> been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 ("§ 1151").  This definition appears in the federal criminal code; however,
courts have also invoked § 1151 in connection with a tribe's civil jurisdiction.  *See Pittsburgh &*
*Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1540-41 (10th Cir. 1995) ("[B]oth the
Supreme Court and this court have concluded § 1151 defines Indian country for both civil and
criminal jurisdiction purposes.").

fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Id.* (citing *Montana*, 450 U.S. at 564).

Hembree contends the Distributors entered into consensual relationships with the Cherokee Nation and its members by distributing products within the tribe's jurisdictional area,[5] including to hospitals and clinics affiliated with the Cherokee Nation. Hembree contends the Pharmacies entered into consensual relationships with the Cherokee Nation and its members by (1) locating pharmacy stores within the Fourteen-county Area; (2) knowingly doing business with Cherokee Nation citizens by selling prescription drugs to individuals on the Cherokee Nation Health Plan; and (3) hiring members of the Cherokee Nation to work as pharmacists and pharmacy technicians.

However, Plaintiffs have submitted evidence through declarations showing that any relationship between Plaintiffs and the Cherokee Nation or its members is limited. For example, CVS provides prescriptions to members of the Cherokee Nation Health Plan through a contract with an independent third party, but does not contract with the health plan itself. (*See* Morton Decl. ¶¶ 8-11.) Similarly, while one of the Distributors provides prescription medications to Cherokee Nation hospitals and clinics, it does not transact directly with the Cherokee Nation; rather, it contracts with the U.S. Department of Veterans Affairs. (Stoy Decl. ¶ 5(j).) Neither party has sought to do business specifically with the other. (*See* Pls.' Reply 27.) Furthermore, the Distributors are not licensed by the Cherokee Nation, (Orenston Decl. ¶ 9 (Cardinal Health); Stoy

---

[5] Hembree contends the Cherokee Nation retains concurrent civil jurisdiction over a territorial area, established through certain treaties in 1835 and 1866, encompassing all or part of fourteen counties in northeastern Oklahoma (hereinafter, the "Fourteen-county Area").

Decl. ¶ 5 (McKesson); Potts Decl. ¶¶ 7, 9 (AmerisourceBergen)), and they do not sell medications directly to consumers in the Fourteen-county Area. (Orensten Decl. ¶¶ 12-13; Stoy Decl. ¶ 5; Potts Decl. ¶ 15.) Nor do the Distributors operate any facilities on land owned by, or held in trust for the benefit of, the Cherokee Nation or its members. (Orensten Decl. ¶¶ 11, 14; Stoy Decl. ¶ 5; Potts Decl. ¶ 10.) Similarly, the Pharmacies do not lease any land from the Cherokee Nation. (*See* Penn Decl. at ¶ 4 (Walmart); Jordan Decl. at ¶ 4 (CVS).) This evidence indicates that at most, any relationships between Plaintiffs and the Cherokee Nation or its members are simply routine business or consumer transactions.

Even assuming *arguendo* that any of the conduct alleged in the Tribal Court Petition took place in Indian country, the mere act of doing business with a tribe or its members, even on tribal land, does not subject a nonmember to broad tribal civil authority. *See Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 941-42 (9th Cir. 2009) ("A nonmember's consensual relationship in one area . . . does not trigger tribal civil authority in another–it is not 'in for a penny, in for a Pound.'" (citing *Atkinson Trading Co.*, 532 U.S. 656)); *see also Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*, 746 F.3d 167, 175 (5th Cir. 2014) (noting "the uncontroversial proposition that a tribe cannot impose any conceivable regulation on a business simply because it is operating on a reservation and employing tribe members"). Rather, "the dispute before the tribal court must arise directly out of that consensual relationship." *Crowe & Dunlevy*, 640 F.3d at 1152; *see also id.* at 1151 (holding that there must be a sufficient "nexus" between consensual relationship and the attendant "exertion of tribal authority" (citing *MacArthur v. San Juan Cty.*, 309 F.3d 1216, 1223 (10th Cir. 2002))).

14

The first *Montana* exception has typically been applied to the taxation of business activities or transactions involving nonmembers, *see Strate*, 520 U.S. at 1415 (discussing cases), or to claims arising from an on-reservation sales transaction between a nonmember plaintiff and member defendant, *see id.* (citing *Williams v. Lee*, 358 U.S. 217, 223 (1959)). Some courts have found that a nonmember defendant's retail or commercial operations on non-Indian fee lands provide a basis for the tribe to tax or regulate aspects of the activity. *See Cardin v. De La Cruz*, 671 F.2d 363, 366-67 (9th Cir. 1982) (tribe had authority to enforce building, safety, and health regulations over nonmember business on non-Indian fee land). But the claims of nuisance, negligence, unjust enrichment, and conspiracy alleged in the Tribal Court Petition are distinct from a tribe's taxation or general regulation of transactions. Plaintiffs have not consented to be broadly governed by tribal law and tribal courts.[6] Furthermore, there is no apparent nexus between the tort injuries alleged in the Tribal Court Petition and any consensual relationship with respect to any of the Distributors and Pharmacies, which have no contractual relationship with the Cherokee Nation relating to prescription opioids and have not specifically sought out tribal members for business relationships. The Pharmacies and Distributors are not members of the Cherokee Nation, nor is their alleged conduct specifically directed at the Cherokee Nation or its members. Finally, there is no connection

---

[6] Hembree suggests that tribal courts "frequently" assert jurisdiction over tort claims against nonmembers. (Hembree Mem. in Opp. to Pls.' Mot. for Prelim. Inj. 22 n.20.) However, courts have noted reasons to exercise caution before finding that a nonmember defendant has consented to be subject to tort liability. *See Duro v. Reina*, 495 U.S. 676, 693 (1990) (abrogated by statute) (noting that in tribal courts, standards of conduct are "influenced by the unique customs, languages, and usages of the tribes they serve," and finding tribal court lacked criminal jurisdiction over nonmember Indian); *UNC Res., Inc. v. Benally*, 514 F. Supp. 358, 363 (D.N.M. 1981) ("A tort defendant is much more at the mercy of chance regarding the nature and extent of the liability to which he may be exposed. It is doubtful whether [movant] could ever be said to have consented to Navajo Tribal Court jurisdiction as a tort defendant, regardless of how extensively it might have done business with the tribe.").

at all between the conduct alleged in the Tribal Court Petition and the Cherokee Nation's sovereign interests in setting conditions on entry, preserving tribal self-government, or controlling internal relations. Accordingly, the Court finds that the common-law claims asserted in the Tribal Court Action clearly fall outside the first *Montana* exception.

### b. Second *Montana* Exception

The second *Montana* exception refers to conduct that threatens or has a direct impact on "the right of reservation Indians to make their own laws and be ruled by them." *Strate*, 520 U.S. at 459. This exception "is a narrow one" and applies only to conduct that "imperil[s] the subsistence of the tribal community." *Crowe & Dunlevy*, 640 F.3d at 1153 (quoting *Plains Commerce Bank*, 554 U.S. at 341); *see also Strate*, 520 U.S. at 459 ("Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: 'Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members . . . . But [a tribe's power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations.'" (citing *Montana*, 450 U.S., at 564) (alterations in original)).

Hembree contends Plaintiffs' alleged conduct amounts to a "mass tort" resulting in an oversupply of opioid drugs and an epidemic of opioid abuse within the Cherokee Nation. (Hembree Mem. in Opp. to Pls.' Mot. for Prelim. Inj. 22.) Several Cherokee Nation officials have provided declarations as to these effects. The Cherokee Nation's Director of Economic Development and Reentry states that 70 to 80 percent of crimes that lead to convictions of Cherokee Nation citizens are drug-related, including "property crimes to get money to buy pills." (Legg Decl. ¶ 10.) An investigator for the Cherokee Nation's Marshal Service states that opioid drug abuse has also led

to increased assaults and batteries, child abuse and neglect, DWIs, public blight, vagrancy, and homelessness. (Roach Decl. ¶ 7.) The executive director of the Cherokee Nation's child welfare office states that opioid abuse by adults has led to a "staggering increase" in the number of Cherokee babies who are dependent on opioids at birth. (Baker Limore Decl. ¶ 8.) Many of these children must be placed in foster or adoptive care with non-Cherokee families, where they are raised without exposure to the tribe's language, history, traditions, and customs. (*Id.* at ¶¶ 8-14.)

The Court is sympathetic to the Cherokee Nation's efforts to stem the proliferation of opioids and repair some of the damage that the nationwide opioid crisis has caused to the tribe and its members. However, a generalized threat of injury to the tribe or its members from tortious conduct is not enough to confer tribal jurisdiction over the conduct of nonmembers. Rather, the second *Montana* exception "envisions situations where the conduct of the nonmember poses a direct threat to tribal sovereignty." *Philip Morris USA*, 569 F.3d at 943 (9th Cir. 2009). The nonmember's conduct must be "catastrophic for tribal self-government." *Plains Commerce Bank*, 554 U.S. at 341; *see also Strate*, 520 U.S. at 450 (examining cases applying the second *Montana* exception and noting that "each of those cases raised the question whether a State's (or Territory's) exercise of authority would trench unduly on tribal self-government").

The epidemic of opioid abuse undoubtedly has had devastating consequences for individuals and families within the Cherokee Nation, with certain economic costs borne by tribal agencies and other entities. However, these consequences do not threaten the Cherokee Nation's ability "to make [its] own laws and be ruled by them." *Strate*, 520 U.S. at 459. Rather, the Tribal Court Petition asserts the right of the Cherokee Nation "to make its own laws and have *others* be governed by them, not the right to self-government." *MacArthur*, 497 F.3d at 1075. *See Norton*, 862 F.3d at

1247 ("[W]hen a tribal member hales a nonmember into tribal court as a defendant, a tribe's interest in self-government is less direct because the suit concerns nonmember conduct." (citing *Philip Morris USA*, 569 F.3d 932, 940 (9th Cir. 2009))).

In two cases cited by Hembree, tribes were found to have a colorable claim to jurisdiction over nonmembers for alleged wrongful conduct. However, central to the courts' reasoning in those cases was the right of a tribe to exclude others from its land–a concern not applicable here. In *Norton*, a recent Tenth Circuit decision, a group of nonmember police officers sought to enjoin an action brought in tribal court arising from the death of a tribe member who was pursued by police officers onto reservation land. The decedent's parents, his estate, and the tribe sued the officers, asserting tort claims. Because of other courts' "repeated confirmations of tribes' right to exclude nonmembers from tribal lands," the Tenth Circuit held that the tribal court had a colorable claim of jurisdiction over the plaintiffs' trespass claim. *Norton*, 862 F.3d at 1246. The court emphasized that "a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands." *Norton*, 862 F.3d at 1244 (citing *Montana*, 450 U.S. at 557); *see also Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 849-50 (9th Cir. 2009) ("The tribe seeks to enforce its regulations that prohibit, among other things, trespassing onto tribal lands, setting a fire without a permit on tribal lands, and destroying natural resources on tribal lands. . . . The tribal regulations at issue stem from the tribe's 'landowner's right to occupy and exclude.'" (citing *Hicks*, 533 U.S. at 359)); *see generally Plains Commerce Bank*, 554 U.S. at 327 (noting that tribal jurisdiction "centers on the land held by the tribe and on tribal members within the reservation.").

In contrast, the Tribal Court Petition purports to protect consumer interests, the health and welfare of tribal members, and economic security–not tribal land resources or its right to exclude

others from tribal land.  The tribe's jurisdiction here is not based on authority of the sort that "goes hand in hand with the power to exclude." *Plains Commerce Bank*, 554 U.S. at 335 (citing *South Dakota v. Bourland*, 508 U.S. 679, 691 n.11 (1993)).  Therefore, the reasoning in these cases cited by Hembree is inapposite.  Furthermore, the court in *Norton* came to the opposite conclusion with respect to the plaintiffs' remaining claims of false imprisonment, false arrest, assault and battery, wrongful death, spoliation of evidence, and conspiracy.  Although the claims "also arose on tribal land, they do not implicate the Tribe's core sovereign interest in excluding non-Indians from tribal lands, or any of the other tribal interests at stake in *Montana's* second exception." *Norton*, 862 F.3d at 1246.  The *Norton* court's view of those claims bears far more relevance to the common-law claims in the Tribal Court Petition.

As in *Norton*, the Cherokee Nation's claims in this case "concern actions that threatened an individual tribal member but do not threaten the Tribe as a whole." *Id.* at 1247 (citing *Strate*, 520 U.S. at 456).  Courts have held it is not enough that a nonmember's conduct "endanger[s] all in the vicinity, and . . . jeopardizes the safety of tribal members." *Strate*, 520 U.S. at 458.  "[I]f *Montana*'s second exception requires no more, the exception would surely shrink the rule." *Id.; see also Norton*, 862 F.3d at 1247 ("To some extent, it can be argued that torts committed by or against Indians on Indian land always threaten or have some direct effect on the political integrity, the economic security, or the health and welfare of the tribe.  But this generalized threat that torts by or against its members pose for any society, is not what the second *Montana* exception is intended to capture." (citing *Phillip Morris USA*, 569 F.3d at 943)).

While noting Defendants' evidence of the harm opioid abuse has caused to individual tribal members and families, and costs borne by the tribe, the Court cannot plausibly find that such harm

is "catastrophic for tribal self-government." *Plains Commerce Bank*, 554 U.S. at 341. Accordingly, the Court finds that even if the alleged conduct occurred within Indian country, the second *Montana* exception does not confer tribal jurisdiction in the Tribal Court Action.

<h3 style="text-align:center">c.     Exhaustion of Common-Law Claims</h3>

With respect to the common-law claims in the Tribal Court Action, Plaintiffs must exhaust their jurisdictional challenge in tribal court unless they have made a substantial showing that an exception applies. The Court finds that Plaintiffs have shown that the lack of tribal court jurisdiction is sufficiently clear, such that further proceedings in the Tribal Court Action would serve no purpose other than delay. First, the tribal court's jurisdiction is presumptively invalid under *Montana* because the Distributors and Pharmacies are nonmembers of the Cherokee Nation. Second, for the reasons set forth *supra* Part IV.A, it is clear that the conduct alleged in the Tribal Court Action falls well outside the Cherokee Nation's inherent sovereign authority to regulate conduct under the first *Montana* exception. Third, for the reasons set forth *supra* Part IV.B, the Court does not find a colorable argument that the Tribal Court Action fits within the narrow second *Montana* exception. The clear lack of jurisdiction is sufficient to excuse Plaintiffs from the exhaustion requirement.

Accordingly, the Court finds that Plaintiffs are substantially likely to show that the tribal court lacks jurisdiction in the Tribal Court Action and that exhaustion should not be required.[7]

## V.     Whether Plaintiffs Will Suffer Irreparable Injury Absent an Injunction

For purposes of a preliminary injunction, irreparable harm is defined as "a significant risk that [plaintiff] will experience harm that cannot be compensated after the fact by monetary

---

[7] Because the Court finds that the tribal court clearly lacks jurisdiction even if any alleged conduct took place in Indian country, it makes no findings regarding the existence or current boundaries of any reservation of the Cherokee Nation.

damages." *New Mexico Dep't of Game & Fish*, 854 F.3d at 1250 (citing *Fish*, 840 F.3d at 751-52)).

The risk of irreparable injury "must be both certain and great" to justify injunctive relief. *Id*. at 1249

(citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)); *RoDa*

*Drilling Co.*, 552 F.3d 1203, 1210 (10th Cir. 2009) (stating that "[p]urely speculative harm will not

suffice" to constitute irreparable injury). However, "'[a] plaintiff who can show a significant risk

of irreparable harm has demonstrated that the harm is not speculative' and will be held to have

satisfied his burden." *RoDa Drilling Co.*, 552 F.3d at 1210 (quoting *Greater Yellowstone Coal. v.*

*Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

Plaintiffs contend that if required to proceed in the Tribal Court Action, they could be subject

to an award of damages that would effectively be unrecoverable. "'[I]mposition of money damages

that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable

injury'" for the purpose of a preliminary injunction. *Crowe & Dunlevy*, 640 F.3d at 1157 (citing

*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010)). Pursuant to

the CAJA, a losing party may be required to post a bond before taking an appeal. CAJA § 3-20

("Upon the filing of a Petition in Error of a civil money judgment, the District Court may order the

filing of a bond or other security in an amount sufficient to satisfy the judgment including costs in

the event the judgment is affirmed on appeal."). Furthermore, the CAJA requires a losing party to

post a supersedeas bond for double the amount of any damages award in order to stay enforcement

of an adverse judgment. *Id.* § 3-20.C.1-3 ("Unless an undertaking is given the perfecting of an

appeal shall not stay enforcement of the judgment or order . . . . The undertaking shall be for double

the amount of the judgment or order."). Finally, "[a] decision of the Supreme Court of the Cherokee

Nation shall lift the stay and the bond shall be released to the prevailing party immediately." *Id.* §

20.D.  Accordingly, if the Cherokee Nation prevails in the Tribal Court Action, Plaintiffs would have no opportunity to seek federal court review until after the supersedeas bond is released to the tribe.  Due to tribal sovereign immunity, Plaintiffs may be unable to sue the Cherokee Nation for return of the bond funds even if a federal court later found that the tribal court lacked jurisdiction.

On behalf of the Cherokee Nation, Hembree sought and obtained an order from the Cherokee Nation District Court stating that the defendants in that case (*i.e.*, Plaintiffs here) "shall not be required to post any appeal or supersedeas bond" in the Tribal Court Action and "may seek a stay of execution of any judgment of this Court pending appeal without the posting of a supersedeas bond or other undertaking."  (Not. of Entry of Trib. Ct. Ord. on Bond Issue, Doc. 130, at 2.)  However, Hembree acknowledges that the tribal court's order is subject to reconsideration or reversal.  (*See id.*)  Moreover, the waiver of a supersedeas bond appears inconsistent with the mandatory language of the CAJA.  While Hembree states that he is amenable to any further protections the Court believes are necessary to protect Plaintiffs from having to post an appeal bond in the Tribal Court Action, he does not indicate under what authority this Court could impose such restrictions.

Hembree objects to the notion that the Cherokee Nation would not return a bond if a federal court reversed the judgment of the tribal court, pointing to the Cherokee Nation's statement to the tribal court that it will not seek to execute a judgment in its favor until after the completion of any federal court review.  However, the tribe has not waived sovereign immunity, and therefore the release of a bond to the Cherokee Nation would impose on Plaintiffs a loss that they "have no realistic way to recoup."  *Crowe & Dunlevy*, 640 F3d at 1157.  This scenario is premised not on an assumption of bad faith by the Cherokee Nation, as Hembree suggests, but on the plain terms of its own law, discussed above.  Unless the Cherokee Nation waives its sovereign immunity in a

proceeding to recover the bond, which it has not indicated it will do, Plaintiffs could be left without legal means to recover the amount of any bond.

Plaintiffs also argue that without an injunction, they would be forced to expend time and money litigating before a tribal court that lacks jurisdiction. Under the CAJA, Plaintiffs would be required to proceed through the tribal court appellate system before they could challenge any adverse jurisdictional ruling in federal court. *See* CAJA § 3-19 ("The District Court shall not certify jurisdictional rulings for interlocutory appeal."). While "economic loss is usually insufficient to constitute irreparable harm," *Crowe & Dunlevy*, 640 F.3d at 1157, in cases where a tribal court clearly lacks jurisdiction, courts have found a litigant's time and expense to defend itself may constitute irreparable harm. *See id.*; *see also Kerr-McGee Corp. v. Farley*, 88 F. Supp. 2d 1219, 1233 (D.N.M. 2000) (finding plaintiff will suffer irreparable damage "as demonstrated by the expense and time involved in litigating this case in tribal court" that lacked jurisdiction); *UNC Res. v. Benally*, 518 F. Supp. 1046, 1053 (D. Ariz. 1981) (finding plaintiff "would be faced with the possibility of irreparable injury if it were forced to appear and defend in Tribal Court" that "very probabl[y]" lacked jurisdiction). The burden and cost of litigation is a significant consideration here, where the Court has found that the tribal court clearly lacks jurisdiction. The apparent scope of this case, the potential amount of damages, and the number of parties make clear that here, as in *Crowe & Dunlevy*, there is a "'significant risk'" that Plaintiffs "'will be forced to expend unnecessary time and effort on litigation in a court that does not have jurisdiction over them.'" 640 F.3d at 1157 (quoting district court opinion, 609 F. Supp. 2d 1211, 1222 (N.D. Okla. 2009)).

In conclusion, the Court finds that Plaintiffs' risk of irreparable injury absent an injunction is both great and non-speculative. Plaintiffs' economic injury could be severe; Hembree has asserted

publicly that damages may be in the hundreds of millions of dollars. Moreover, should the tribe prevail in the Tribal Court Action, the bond requirement could result in an unrecoverable loss due to tribal sovereign immunity. The CAJA bond provisions, combined with the tribe's sovereign status, constitute "unique circumstances" creating a substantial risk of irreparable harm. *Id.* at 1157. In addition, because the tribal court clearly lacks jurisdiction such that further proceedings there would serve no purpose other than delay, the Court finds that litigation of this case through the tribal court system, without an opportunity for interlocutory review, would impose a substantial burden on Plaintiffs. Accordingly, Plaintiffs have met their burden to show irreparable injury to justify a preliminary injunction.

VI.    **Whether Plaintiffs' Threatened Injury Outweighs Defendants' Injury if an Injunction Issues**

Hembree contends that a preliminary injunction would harm the Cherokee Nation's ability as a sovereign to protect its members from harm by enforcing its own laws in its own courts. However, the Cherokee Nation could assert claims to redress any injury in another, non-tribal forum. Furthermore, as discussed *supra* Part IV, the tribal court plainly lacks jurisdiction in the Tribal Court Action. Accordingly, the Court finds any injury to the Cherokee Nation's sovereign interests from an injunction is unlikely. *See id.* at 1158 (finding "unpersuasive" tribal court judge's argument that injunction would invade court's authority). Any potential injury to the Cherokee Nation does not outweigh the certain and great injury to Plaintiffs if the Court does not enjoin the Tribal Court Action.

VII.    **Whether an Injunction is Adverse to the Public Interest**

Hembree contends an injunction would contravene the congressional policy of supporting tribal self-government and would deprive the federal courts of the benefits of tribal expertise.

However, as explained *supra* Part IV, the conduct alleged in the Tribal Court Action does not concern tribal self-government or directly affect tribal sovereignty. The lack of tribal court jurisdiction over this matter is clear, and it would not serve the public interest to require Plaintiffs to litigate through the tribal court system before challenging jurisdiction in this Court. Accordingly, the Court finds that the public interest favors an injunction.

## VIII.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (Doc. 13) is GRANTED. Defendants and their agents, employees, successors, and assigns are hereby enjoined from taking any action or any step in the Tribal Court Action as it relates to Plaintiffs until this action is resolved. As set forth in the Court's July 6, 2017 Order (Doc. 73), the parties are directed to file a Joint Status Report within sixty days.

**SO ORDERED** this 9th day of January, 2018.

**TERENCE KERN**
**United States District Judge**